**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

X STRATEGIES, LLC,

Plaintiff,

v. CASE NO. ________________

DEREK UTLEY,
STARK DEFENSE INDUSTRIES
INC., ANNA WEISHEIMER, and
ANNA DICENZO FITNESS LLC.

Defendants.

_________________________/

# COMPLAINT

Plaintiff, X Strategies, LLC ("X Strategies" or the "Company"), hereby files this Complaint against Defendants, Derek Utley ("Utley"), Stark Defense Industries, Inc. ("Stark Industries"), Anna Weisheimer a/k/a Anna Dicenzo ("Weisheimer"), and Anna Dicenzo Fitness, LLC ("Dicenzo Fitness") (collectively, "Defendants"). In support thereof, X Strategies alleges as follows:

## INTRODUCTION

1. X Strategies is a prominent social media strategy and consulting firm headquartered in Palm Beach County, Florida. X Strategies provides strategic consulting services to companies, organizations, and prominent individuals designed to enhance their visibility, engagement, reach, and growth on social media. X Strategies helps its clients achieve their social media marketing goals and objectives.

2. Utley is the former Chairman and Chief Financial Officer ("CFO") of X Strategies. In that role, Utley was responsible for overseeing X Strategies' internal operations, management, accounting, and finances. Utley had unrestricted and exclusive access to X Strategies' systems, databases, and banking accounts.

3. Beginning in 2021, and continuing through 2026, Utley embezzled millions of dollars from X Strategies. Utley exploited his exclusive control over X Strategies' finances and the position of trust he held as a senior officer of X Strategies to siphon off funds for his own personal benefit. Utley disguised personal expenditures as business expenses, laundered and gambled stolen funds at casinos (keeping the winnings for himself, if he won, but causing X Strategies to absorb the losses – he lost far more than he won), diverted company funds to personal investments and to Stark Industries and Dicenzo Fitness (entities owned and controlled by Utley), and fabricated financial records to conceal his embezzlement.

4. As Utley embezzled more money from X Strategies year-over-year, his extravagant lifestyle grew and his gambling addiction accelerated. Using money stolen from X Strategies, Utley purchased luxury sports cars, designer clothing, jewelry, traveled to exclusive locations first-class (with an entourage), and wagered higher amounts at casinos on a more regular basis. Using the Company's money, Utley won a total of $26,000,000 playing slots at a single casino in a single year (spending 200 days out of the year in that casino). Utley, however, also lost $29,000,000 at this casino during the same time period, ultimately leading to a net loss of $3,000,000.

5. After X Strategies discovered Utley's embezzlement, Utley engaged in a campaign of deceit and dishonesty, resulting in his departure. On his way out, Utley engaged in a calculated campaign to sabotage X Strategies' client relationships, steal customers, divert funds from X Strategies, and disparage X Strategies to current and prospective clients.

6. A forensic audit of X Strategies' finances, which remains ongoing, has revealed that Utley embezzled at least $5,000,000. This action seeks to recover those stolen funds, to hold Utley and his co-conspirators accountable, and to prevent him from causing further harm to X Strategies.

**THE PARTIES**

7. X Strategies is a limited liability company with its principal place of business in Palm Beach County, Florida. X Strategies is a social media consulting and strategic communications firm that provides consulting services to companies, organizations, and individuals seeking to enhance their visibility and engagement on social media. X Strategies is an industry leader with a proven track record of exceptional results.

8. Utley is an individual who resides in Palm Beach County, Florida. Utley is the former Chairman and CFO of X Strategies. Utley controlled the Company's finances and oversaw its internal operations, management, and accounting until his removal from leadership and subsequent termination. Utley currently identifies himself as the President of Tower Strategy, a former client and now competitor of X Strategies with offices in West Palm Beach, Florida.

9. Stark Industries is a Florida corporation with its principal place of business in Palm Beach County, Florida. Stark Industries is wholly owned and controlled by Utley. Stark Industries is a former owner of X Strategies.

10. Dicenzo Fitness is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Dicenzo Fitness owns and has investments in fitness studios located in Miami-Dade County, Florida. Dicenzo Fitness is owned and controlled by Stark Industries, Utley, and Weisheimer. Upon information and belief, Dicenzo Fitness is a front used by Utley and Weisheimer to launder funds embezzled from X Strategies.

11. Weisheimer is an individual who resides in Miami-Dade County, Florida. Weisheimer is a member and partial owner of Dicenzo Fitness.

**JURISDICTION AND VENUE**

12. This is a civil action for, among other things, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, breach of fiduciary duty, civil theft, fraud, conversion, unjust enrichment, violations of the Florida Deceptive and Unfair Trade Practices Act, unfair competition, and imposition of a constructive trust.

13. The amount in controversy exceeds the sum of $75,000, exclusive of interest, costs, and attorney fees.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the laws of the United States.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district, X Strategies maintains its principal place of business in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS

### Founding and Management of X Strategies

17. X Strategies was founded in 2017 by Utley and Mr. Alexander Bruesewitz ("Bruesewitz"). At the time, Utley was thirty-two (32) years of age and Bruesewitz was nineteen (19) years of age. Utley owned 50% of X Strategies through his company, Stark Industries. Bruesewitz owned 50% of X Strategies through a limited liability company that he was the sole member of.

18. Between 2017 and early 2026, Utley acted as the Chairman and CFO of X Strategies. In that role, Utley was responsible for overseeing the finances, management, accounting, and operations of X Strategies. Utley had exclusive access to X Strategies' bank accounts and financial records.

19. From 2017 through the present, Bruesewitz acted as the Chief Executive Officer of X Strategies and was responsible for overseeing sales, client services, and the management of the Company's employees and independent contractors.

20. X Strategies' revenues grew steadily over the years as well as X Strategies' prominence and reputation within its industry. X Strategies eventually became a nationally leading social media and consulting firm.

21. To better serve its current clients and attract new clients, X Strategies moved its corporate headquarters to West Palm Beach, Florida in 2019.

22. As a result of the excellent work done by Bruesewitz, his personal attributes, and his significant social media influence, Bruesewitz's prominence and reputation grew with the success of X Strategies and helped accelerate X Strategies' growth. Utley's social prominence and reputation, however, did not grow along with X Strategies' success and did not contribute to its growth.

Utley Embezzlement of Company Funds[1]

23. Despite his growing prominence and influence, Bruesewitz remained true to his character and purpose. He was not driven by the pursuit of wealth, but by a desire to make a positive impact in the industry and provide high-quality services to X Strategies' clients. He maintained strict sobriety, remained focused on his work, and resisted the temptation to significantly elevate his lifestyle. Over time, he became a trusted advisor to world leaders, fully embraced his faith through baptism, and married.

[1] X Strategies' investigation into Utley's theft remains ongoing because (a) Utley intentionally kept terrible books and records, (b) Utley was hiding his theft through a complex scheme of structured transactions, (c) X Strategies does not have complete knowledge of all accounts Utley opened, and (d) and X Strategies has no access to the X Strategies' bank accounts that were closed due to Utley's actions.

24. Utley, on the other hand, underwent a significant negative transformation as X Strategies grew. Financial gain and social influence became a driving force in his life. As X Strategies and Bruesewitz gained prominence, Utley developed a resentment for Bruesewitz and his success. Utley developed an alcohol dependency and a gambling addiction.

25. Utley's work for X Strategies slowly ceased to be his priority. Utley began showing up to work less often over time and performing less of his work duties. It was not apparent to Bruesewitz initially that Utley had developed alcohol and gambling addictions.

26. Bruesewitz trusted that, even though Utley was working less and offering less value to X Strategies, he was still diligently managing X Strategies' finances and accounting, internal operations, and internal management. Because X Strategies continued to grow in prominence, attracting high profile clients and turning a profit, Bruesewitz believed that Utley was doing his job. Bruesewitz trusted that Utley remained an honest and integrous person.

27. Unfortunately, Bruesewitz was wrong. Behind his back, Utley was concocting a scheme to embezzle money from X Strategies to fuel his increasingly extravagant lifestyle and addictions. Bruesewitz's historical trust of Utley caused him to permit Utley to maintain exclusive control over X Strategies' bank accounts, bookkeeping, and financial reporting. This placed Utley in a unique position to hide his malfeasance and theft. Utley exploited this position of trust to perpetuate his scheme and conceal his wrongdoing from Bruesewitz.

28. Utley's embezzlement scheme was brazen, complex, and multifaceted. To start, Utley began disguising large personal withdrawals to Stark Industries as legitimate business expenses. To further launder the funds, Stark Industries would route them through a complex web of banking transactions that ultimately provided the funds to Utley, to other companies that he owned (like Dicenzo Fitness), or to entities and individuals that Utley owed money to.

29. Utley disguised his embezzlement by flooding X Strategies' bank statements with a high volume of financial transactions on a near-daily basis, moving funds among different company accounts and transferring money into and out of those accounts, in order to conceal the unauthorized withdrawals. This is a common tactic used by embezzlers and money launderers to conceal illegal activity.

30. Ultimately, Utley became more and more brazen over time. He began routing withdrawals straight to himself, began withdrawing company funds directly from ATMs at various casinos throughout the US, and became less disciplined in his efforts to directly conceal the embezzlement on the Company's books.

31. When Utley's abnormally high volume of banking transfers drew scrutiny from X Strategies' banks, Utley would lie and make false representations to the bank about the reasons for the unconventional activity. For example, Utley would falsely represent that the large withdrawals he made at various casinos were necessary expenses for entertaining clients and were otherwise authorized by X Strategies. He also falsely represented that the high

volume of wire transfer activity was necessary for X Strategies' business operations.

32. To extract additional funds from X Strategies without drawing more scrutiny, Utley maintained a designation as a W-2 employee, taking a salary in addition to his company distributions. X Strategies did not authorize Utley to make this designation as both Utley and Bruesewitz had agreed to forego W2 status to ensure more resource availability for company growth.

33. Utley consistently lied to Bruesewitz about the Company's performance, revenues, and expenses, and lied about how much revenue X Strategies had re-invested in company growth. Utley also kept incomplete and confusing books and records to further hide his malfeasance, fabricating X Strategies' financial records to further hide his embezzlement from Bruesewitz and other company members. On a monthly basis, Utley would regularly report false financial statistics and would tell Bruesewitz that he would send the written financial reports at a later date to support his oral summary. These financial misrepresentations occurred in-person at X Strategies' headquarters. Bruesewitz believed at the time that X Strategies' financial records were being properly maintained, audited, and tracked by Utley and professional accounting firms. But, ultimately, they were not.

34. Utley's theft from X Strategies allowed him to fund an increasingly extravagant lifestyle. He began purchasing luxury sports cars, designer clothes, and renting opulent condominiums. He also began taking lavish vacations and attending high-profile events with an entourage, funded by money he embezzled from X Strategies.

35. Utley also began purchasing luxury items for his then girlfriend, Weisheimer. At all times, Weisheimer knew that Utley was embezzling funds from X Strategies and encouraged him to continue doing so. Weisheimer profited substantially from Utley's embezzlement, and she purchased (or had Utley purchase her) designer clothes, designer handbags, and designer jewelry with X Strategies' funds.

36. Utley portrayed his extravagant lifestyle as a product of his substantial gambling winnings, his standard paycheck from X Strategies, and alternate income streams. Bruesewitz believed this to be true at the time. Although Bruesewitz did not agree with Utley's undisciplined lifestyle, Bruesewitz believed Utley simply had different personal priorities and was not financially frugal with his earnings.

Utley Gambled With Company Funds

37. Utley used various casinos across the United States, including Las Vegas, Nevada and Coconut Creek, Florida, to further launder the funds he stole from X Strategies.

38. Utley opened up accounts at casinos where he would mix funds he stole from X Strategies with money from other sources. Utley would also withdraw funds directly from X Strategies' bank account at the casino's ATM (under the guise of entertaining clients), then re-deposit the funds in his personal casino account after gambling. Utley then kept the stolen funds in these casino accounts to make them hard to trace and hard to access.

39. Eventually, Utley's gambling evolved from a method of laundering funds to an addiction. Utley began to spend days on end at casinos across the

United States, gambling into the early hours of the morning and drinking heavily.

40. In 2025 alone, Utley spent two hundred (200) days gambling at the Hard Rock casino in South Florida, using the Company's money to win over $26,000,000 playing slots, but ultimately losing $29,000,000 for a total loss on the slot machines of $3,000,000 that year. It is unknown how much Utley won or lost gambling company money on other games of chance or table games at these casinos.

41. As Utley's addictions continued to grow, he began to steal money from X Strategies for the sole purpose of funding his gambling addiction. When he lost, the money was gone forever. But when he won, he kept the winnings for himself. X Strategies took all the risk—Utley got all the reward. Utley accrued an untold number of perks, benefits, credits, and other things of value for himself as a result of his gambling of X Strategies' money at these casinos.

<u>Utley's Personal Investments Using Company Funds</u>

42. In addition to embezzling Company money to fund his luxury lifestyle and gambling addiction, Utley used X Strategies' funds to make personal investments in other companies. Utley used X Strategies' funds to purchase himself equity in various business interests. Any return on the investments was kept by Utley. Any loss was born by X Strategies. Once again, X Strategies took all of the risk—Utley got all of the reward.

43. On or about October 30, 2025, Utley wired $65,000 from X Strategies to Stark Industries, directly followed by a wire transfer to Tabby, a payment technology company that Stark Industries and Utley purchased a stake

in. Utley and Stark Industries have substantially profited from this investment they made with funds stolen from X Strategies.

44. On or about February 2026, Utley and his then-girlfriend Weisheimer, embezzled a significant amount of X Strategies' funds to purchase a fitness studio together.

45. Utley and Weisheimer formed a separate LLC called Dicenzo Fitness (named after Weisheimer's alias). Utley made Stark Industries and Weisheimer members of Dicenzo Fitness. Utley then transferred X Strategies' funds to himself, to Stark Industries, or to Weisheimer, who then routed funds to Dicenzo Fitness to purchase and take ownership of a fitness studio in Miami, Florida.

46. Utley, Stark Industries, Weisheimer, and Dicenzo Fitness have profited substantially from the purchase of the fitness studio using X Strategies' funds.

47. Upon information and belief, Utley and Stark Industries used Dicenzo Fitness as an additional method of laundering the funds Utley stole from X Strategies, injecting stolen funds onto the balance sheets of Dicenzo Fitness and disguising them as legitimate income in order to hide their origins.

48. Utley made many other investments with X Strategies' funds, purchasing personal stakes in a variety of other business interests.

<u>Utley Diverted Company Opportunities</u>

49. Utley also stole company opportunities and customers while serving as the Chairman and CFO of X Strategies.

50. Instead of presenting opportunities to X Strategies, Utley stole the opportunities for himself or diverted them to his other companies, including Stark Industries.

Utley Took Out Unnecessary High-Interest Rate Loans

51. Eventually, Utley's embezzlement of Company funds outpaced X Strategies' revenues and Utley forced X Strategies to take out high-interest rate loans so Utley could continue stealing at the same pace without getting caught. Utley never notified Bruesewitz that he caused X Strategies to take out high-interest rate loans.

X Strategies Catches Utley

52. In 2026, X Strategies hired prominent South Florida businessman, Michael Seifert ("Seifert"), to be its President. Prior to joining X Strategies, Seifert was the CEO of a publicly traded company. In addition, Seifert was a longtime friend of both Utley and Bruesewitz. Seifert was brought in to professionalize X Strategies, increase sales, and diversify X Strategies.

53. Immediately upon joining X Strategies, Seifert noticed that something was not right with X Strategies' accounting and finances. X Strategies' cash on hand was mathematically inconsistent with its reported revenues. After accounting for distributions paid to Stark Industries and Bruesewitz's company, as well as operating expenses, X Strategies should have had millions of dollars more in cash than it actually did.

54. Unexpectedly, X Strategies had received a late-night message from a third-party who stated that Utley had just requested an urgent large cash wire transfer so X Strategies could make payroll the following day. Utley had called

the third-party late at night from a casino in Las Vegas, highly intoxicated, and pleaded with the third-party to wire transfer a substantial sum of cash to Utley, allegedly so he could ensure X Strategies made payroll.

55. In reality, Utley just had lost a substantial amount of money at the casino and needed additional gambling money to get out of the hole he dug himself that night. X Strategies told the third-party not to transfer the money to Utley because the situation sounded like a scam.

56. The situation was highly concerning to X Strategies and Seifert investigated it. He discovered that Utley had in fact tried to scam this third-party into sending him a large amount of money by falsely claiming he needed it for X Strategies' payroll.

57. Seifert suggested that X Strategies audit its books and records and Bruesewitz agreed.

58. To start the audit, Seifert requested access to X Strategies' bank accounts from Utley. Initially, Utley refused to give Seifert access. This, of course, was unacceptable and untenable. Eventually, Utley relented and gave Seifert access to X Strategies' bank accounts.

59. What Seifert discovered was shocking. After sifting through the voluminous daily transactions that Utley used to disguise his embezzlement, Seifert learned that Utley was regularly withdrawing large sums of money from X Strategies' bank accounts at casinos, X Strategies was regularly sending Utley and Stark Industries large sums of money for no apparent reason, and Utley was reimbursing himself for significant expenditures that had nothing to do with the business of X Strategies.

60. Seifert learned that multiple banks had shutdown X Strategies' bank accounts due to suspicious transactions and he discovered the high-interest rate loans Utley took out on behalf of the Company.

61. Seifert determined that Utley's numerous payments to himself, and Stark Industries, were not distributions because almost none of the transfers had an equivalent payment to Bruesewitz.

62. After discovering that Utley had been looting X Strategies, Seifert confronted Utley. Utley initially denied what he had done.

63. Utley then ultimately admitted to Seifert that he stole millions of dollars from X Strategies. Utley blamed the theft on his low self-esteem, his desire to have more influence and impress others, and his gambling and alcohol addictions.

Utley's Removal from X Strategies

64. Seifert presented Bruesewitz with the information he discovered during his investigation of Utley and recommended that Utley be removed from X Strategies' leadership immediately. Bruesewitz reviewed Seifert's findings and agreed that Utley could no longer continue in his current role.

65. On April 3, 2026, Stark Industries voluntarily relinquished its ownership interest in X Strategies and Utley voluntarily resigned as the Chairman and CFO of X Strategies.

66. X Strategies was hopeful that Utley could receive help for his problems and help contribute to X Strategies' success again. X Strategies permitted Utley to become a normal W-2 employee on a temporary basis, with tight restrictions and expectations, if he committed to honesty, integrity, and

seeking treatment for his gambling and alcohol addictions. Utley agreed to all these conditions.

67. Utley's new job duties included, but were not limited to:

a. sales;

b. client relations;

c. promoting a positive work environment;

d. complying with the Company's policies and procedures;

e. complying with the highest ethical standards; and

f. performing any other tasks as directed by the Company's Chief Executive Officer.

68. Utley was expected to physically work in X Strategies' office and to be in the office most working days.

<u>Utley's Actions as an Employee of X Strategies and Termination</u>

69. Utley's employment with X Strategies was unsuccessful from the outset. He refused to work in the office on a regular basis and was frequently unavailable during normal business hours, especially in the mornings. He had no new sales. He did not improve or even maintain X Strategies' relationship with any of its clients. X Strategies' other employees did not want to work with Utley due to his poor attitude and unprofessional behavior.

70. It is unknown whether Utley ultimately sought treatment for his gambling and alcohol addictions, but his behavior during this time period provided every indication that he did not.

71. It quickly became apparent that Utley had no intention of performing any of his job duties for X Strategies.

72. Seifert confronted Utley about his abysmal performance and lack of attendance and availability.

73. Utley told Seifert that his poor performance was the result of an injury he suffered six (6) months earlier while riding in an Uber. Utley claimed that he was traveling as a passenger in an Uber that was hit by another vehicle traveling at over sixty (60) MPH. Utley claimed the vehicles involved were totaled and that he was significantly injured in the crash.

74. Utley demanded six (6) months' paid leave to recover from the alleged auto accident.

75. Of course, Utley had never informed anyone at X Strategies that this alleged auto accident occurred before.

76. Seifert asked Utley to provide X Strategies with whatever records Utley had to substantiate that the auto accident occurred and that he had suffered a serious injury.

77. In response, Utley stated that he had no records that the accident occurred and said there was no police report from the accident. Utley claimed, incredulously, that he called another Uber and left the scene of the accident before any police officers arrived on the scene.

78. Utley did, however, submit what he purported to be corroborating medical records to X Strategies. The medical records, allegedly from Radius TBI of South Florida, provided a diagnosis for Utley and stated that he required six (6) months off work.

79. Seifert called Radius TBI of South Florida to confirm the legitimacy of the medical record. Radius TBI of South Florida stated that the medical

records provided to X Strategies by Utley were fake. Radius TBI of South Florida's medical professionals never created or signed these medical records.

80. In reality, Utley had created fake medical records, forged the signature of a practicing medical doctor, and submitted them to X Strategies in an attempt to fraudulently get six (6) months paid medical leave.

81. X Strategies terminated Utley for submitting fake medical records.

82. X Strategies and Utley had entered into an Employment Agreement that governed Utley's termination. A copy of the Employment Agreement is attached as **Exhibit A.**

83. The Employment Agreement contained, among other provisions, a non-compete clause restricting Utley from competing with X Strategies for one year following the termination of his employment:

> Non-Solicitation. During Employee's employment with the Company and for a one (1) year period of time thereafter, Employee shall not directly (whether as a partner, shareholder, agent, independent contractor, employee, or otherwise), or indirectly (whether through a Company, partnership, affiliate, subsidiary or otherwise): (i) solicit clients of the Company in existence on the date Employee last works for the Company; nor (ii) communicate with any persons or other business-related entities in order to induce, facilitate, or encourage the assignment of business opportunities away from Company.

Utley's Post-Termination Misconduct

84. Following his termination, Utley continued attempts to embezzle funds from X Strategies. Utley contacted X Strategies' clients and represented that X Strategies was experiencing issues with its bank accounts. He instructed those clients to remit payment on outstanding invoices directly to him, claiming that he would then forward the funds to X Strategies. Those representations

were false. At the time he made them, Utley was no longer authorized to receive payments on behalf of X Strategies, and his actions were an apparent attempt to divert company funds for his own benefit following his departure from the company.

85. After his termination, Utley stole X Strategies' mail out of its UPS store mailbox on multiple occasions. Utley still possesses this mail.

86. Using his knowledge of X Strategies' customer list and pricing structure, Utley made efforts to compete with X Strategies and solicit its current and prospective clients for a competing business he started. Utley called multiple X Strategies' clients and attempted to solicit them to terminate their advantageous business relationship with X Strategies and hire him instead. Utley disparaged X Strategies to these current and potential clients.

87. Utley has since provided, or attempted to provide, services that compete directly with X Strategies to current or prospective clients of X Strategies.

88. Utley is currently working for a former client turned competitor of X Strategies, Tower Strategy, in its West Palm Beach office. After his termination, Utley solicited long-time client Tower Strategy to cease being a client of X Strategies. Utley provided Tower Strategy with all of the confidential information he gained from X Strategies to help Tower Strategy directly compete against X Strategies.

89. In other words, Utley stole a client of X Strategies, provided it with the confidential information necessary to perform the services that X Strategies

performs, and is now competing directly with X Strategies while working for this former client.

90. Additionally, Utley had opened numerous credit cards, lines of credit, and accounts in X Strategies' name which he continued use to pay for his personal expenses.

X Strategies' Forensic Audit and Damages

91. Seifert realized that the scope and complexity of Utley's scheme warranted the use of a professional accounting firm to perform a forensic audit. X Strategies engaged Vessel Advisors, a professional accounting firm, to conduct an audit of X Strategies' books and records to determine how much money Utley stole from X Strategies. Vessel Advisors' audit remains ongoing but has already revealed that Utley embezzled at least $5,000,000 from X Strategies.

92. Advisors also discovered a second high interest rate loan that Utley had bound X Strategies to with no legitimate business reason. Utley had never notified Seifert about this loan, and it was not properly reflected in the Company's books and records. The loan was already in default and had to be paid off immediately with penalties.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST DEFENDANT UTLEY)**

93. Plaintiff realleges and incorporates paragraphs 1-68, and 91-92 as if fully set forth herein.

94. Utley, as Chairman and CFO of X Strategies and an owner of the Company, owed fiduciary duties of loyalty, care, and good faith to X Strategies.

Utley's fiduciary duties required him to act in the best interests of X Strategies, to refrain from self-dealing, to disclose material information honestly and completely, to avoid conflicts of interest, and to not use his position for personal gain at the Company's expense.

95. Utley breached his fiduciary duties to X Strategies by, among other things: (a) embezzling at least $5,000,000 from X Strategies; (b) disguising personal withdrawals as legitimate business expenses; (c) diverting X Strategies' funds to Stark Industries and other entities for his personal use; (d) unilaterally designating himself as a W-2 employee and taking unauthorized salary payments; (e) gambling with Company funds and keeping any winnings for himself while causing the Company to absorb losses; (f) using Company funds to make personal investments; (g) diverting corporate opportunities for his personal benefit, including the Renovaro opportunity; (h) causing the Company to take out high-interest rate loans without authorization; (i) fabricating financial records and lying about the Company's performance; (j) taking Tower Strategy away from X Strategies as a client and using it to compete against X Strategies; and (k) engaging in a complex scheme of structured transactions to conceal his theft.

96. Utley's breaches of fiduciary duty were intentional, willful, and calculated to benefit himself at the expense of X Strategies. Utley exploited the position of trust he held as Chairman, CFO, and an owner to perpetuate his scheme and conceal his wrongdoing.

97. As a direct and proximate result of Utley's breach of the fiduciary duties he owed to X Strategies, X Strategies has suffered damages.

**COUNT II**
**CIVIL THEFT (Fla. Stat. § 772.11)**
**(AGAINST UTLEY AND STARK INDUSTRIES)**

98. Plaintiff realleges and incorporates paragraphs 1-68, and 84-92 as if fully set forth herein.

99. In violation of Florida Statutes Sections 812.012-812.037, Utley and Stark Industries knowingly obtained, and conspired with each other to obtain, funds that belonged to X Strategies.

100. Utley and Stark Industries knowingly and intentionally obtained or used, or endeavored to obtain or use, funds and property belonging to X Strategies with the felonious intent to temporarily or permanently deprive X Strategies of the right to the property or a benefit from the property.

101. Specifically, Utley and Stark Industries stole from X Strategies by, among other things: (a) embezzling at least $5,000,000 from X Strategies' bank accounts; (b) withdrawing large sums of money from X Strategies' bank accounts at casinos to fund his gambling addiction; (c) diverting X Strategies' funds to Stark Industries and other entities for personal use; (d) unilaterally designating himself as a W-2 employee and taking unauthorized salary payments; (e) using Company funds to make personal investments while keeping the equity for himself; (f) gambling with Company funds, keeping winnings for himself while causing the Company to absorb the losses; and (g) diverting corporate opportunities belonging to X Strategies for their personal benefit.

102. X Strategies has provided, or will provide prior to trial, the written demand required by Florida Statute § 772.11.

103. As a direct and proximate result of Utley and Stark Industries' theft, X Strategies has suffered damages in excess of $5,000,000. Pursuant to Florida Statute § 772.11, X Strategies is entitled to recover threefold the actual damages sustained, reasonable attorney's fees, and court costs.

**COUNT III**
**FRAUDULENT MISREPRESENTATION**
**(AGAINST DEFENDANT UTLEY)**

104. Plaintiff realleges and incorporates paragraphs 1-41, 52-63, and 91-92 as if fully set forth herein.

105. Utley made false statements of material fact to X Strategies and its representatives, including statements regarding the Company's financial condition, revenues, expenses, bank accounts, and transactions. Utley's false statements included, but were not limited to: (a) false representations regarding the nature and purpose of wire transfers and payments from X Strategies to Stark Industries and other entities; (b) false representations that expenditures were legitimate business expenses when they were in fact personal expenses; (c) fabricated financial records designed to conceal his embezzlement; and (d) lies about the Company's performance, revenues, and expenses.

106. Instead of being a good steward of the Company's finances, like he purported to be doing, he gambled with tens of millions of dollars of the Company's money. In just 2025 alone, Utley gambled $29,000,000 of the Company's money at slots at a single casino, ultimately losing $3,000,000.

107. At the time Utley made these false statements, Utley knew that the statements were false.

108. Utley made these false statements with the intent to induce X Strategies to act in reliance upon them, specifically to allow him to continue his scheme to embezzle Company funds without detection.

109. X Strategies justifiably relied upon Utley's false statements because Utley was the Chairman and CFO of the Company, had exclusive access to the Company's bank accounts and financial records, and held a position of trust within the organization.

110. As a direct and proximate result of Utley's fraud, X Strategies has suffered damages in an amount to be determined at trial.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**(AGAINST DEFENDANT UTLEY)**

111. Plaintiff realleges and incorporates paragraphs 1-41, 52-63, and 91-92 as if fully set forth herein.

112. Utley made false statements of material fact to X Strategies as noted above.

113. Utley knew these representations were false. Alternatively, Utley should have known these representations were false because Utley failed to exercise reasonable care or competence in obtaining or communicating the information he provided to X Strategies.

114. The false information supplied by Utley included, but was not limited to: (a) false representations regarding the nature and purpose of Company expenditures and transactions; (b) fabricated or manipulated financial records; (c) misrepresentations regarding the Company's cash position, revenues, and expenses; and (d) concealment of the high-interest rate

loans he caused the Company to take out. He never disclosed that he was spending all day every day at casinos gambling at slot machines with the Company's money.

115. Utley, as Chairman and CFO of X Strategies with exclusive control over the Company's finances, accounting, and financial reporting, supplied false information to X Strategies and its representatives in the course of his business or profession, or in a transaction in which he had a pecuniary interest.

116. Utley intended for X Strategies to rely on his false representations.

117. X Strategies justifiably relied on the false information supplied by Utley because Utley was the Chairman and CFO of the Company with exclusive access to and control over the Company's bank accounts, financial records, and accounting.

118. As a direct and proximate result of Utley's negligent misrepresentations, X Strategies has suffered damages.

## COUNT V
## RICO (18 U.S.C. §§ 1961-1968)
## (AGAINST ALL DEFENDANTS)

119. Plaintiff realleges and incorporates paragraphs 1-92 as if fully set forth herein.

120. At all times relevant hereto, Utley, Weisheimer, Stark Industries, Dicenzo Fitness, and other entities controlled by Utley, constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

121. Utley conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

122. The pattern of racketeering activity consisted of multiple predicate acts of: (a) wire fraud, in violation of 18 U.S.C. § 1343, including the use of electronic communications, wire transfers, and electronic banking systems to effectuate his scheme to defraud X Strategies; (b) bank fraud, in violation of 18 U.S.C. § 1344; (c) money laundering, in violation of 18 U.S.C. §§ 1956–1957; and (d) mail fraud, in violation of 18 U.S.C. § 1341, including the use of the United States mails to further his scheme to defraud.

123. The predicate acts of racketeering activity constituted a "pattern" within the meaning of 18 U.S.C. § 1961(5) because they were related to each other, spanned a period of years (from at least 2021 through the present).

124. Utley's racketeering activity was the proximate cause of injury to X Strategies. X Strategies was injured by, among other things, the embezzlement of its funds, the diversion of its business opportunities, the destruction of its banking relationships, and the impairment of its client relationships.

125. Pursuant to 18 U.S.C. § 1964(c), X Strategies is entitled to recover threefold the damages it sustained, together with the cost of this suit, including reasonable attorney’s fees.

## COUNT VI
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

126. Plaintiff realleges and incorporates paragraphs 1-68 and 84-92 as if fully set forth herein.

127. Defendants were unjustly enriched by receiving and retaining embezzled funds, personal investments purchased with company money,

unauthorized salary payments, and the proceeds of diverted business opportunities.

128. Stark Industries specifically received substantial wire transfers of embezzled funds from X Strategies, which it then forwarded to Utley or used as directed by Utley for his personal benefit.

129. Dicenzo Fitness received substantial wire transfers of embezzled funds from X Strategies which it used to purchase assets that would ultimately benefit Utley.

130. Weisheimer either directly received substantial wire transfers of embezzled funds from X Strategies, or otherwise received embezzled funds indirectly through Dicenzo Fitness, and enjoyed the substantial profits generated by those funds.

131. Utley received substantial wire transfers of embezzled funds from X Strategies and enjoyed the substantial profits generated by those funds.

132. X Strategies conferred a benefit upon Defendants by, among other things, entrusting Utley with control over its finances, providing him with access to its bank accounts and business resources, and paying distributions to Stark Industries as a member of the Company. In addition, X Strategies conferred a benefit on Defendants by providing them with its substantial industry connections, customer list, trade secrets, and ultimately the funds that Utley, Stark Industries, Weisheimer, and Dicenzo Fitness took from the company.

133. Defendants knew and appreciated the benefit conferred upon them by X Strategies.

134. Under the circumstances, it would be inequitable for Defendants to retain the benefit without paying the value thereof to X Strategies.

135. Specifically, Defendants were unjustly enriched by: (a) at least $5,000,000 in funds embezzled from X Strategies; (b) personal investments made with Company funds, including investments in Tabby and other companies; (c) 500,000 shares of Renovaro stock obtained through the diversion of a corporate opportunity belonging to X Strategies; (d) unauthorized W-2 salary payments taken by Utley; (e) luxury vehicles, designer clothing, jewelry, and other personal property purchased with embezzled funds; (f) gambling winnings obtained using company funds while losses were absorbed by the Company; (g) a fitness studio and the subsequent revenue generated by its operation, and (h) other assets and benefits traceable to X Strategies' funds.

136. As a result of Defendants' unjust enrichment, X Strategies has been damaged in an amount to be determined at trial.

## COUNT VII
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. § 501.201 et seq.)
## (AGAINST DEFENDANT UTLEY)

137. Plaintiff realleges and incorporates paragraphs 1-92 as if fully set forth herein.

138. Utley engaged in unfair competition against X Strategies through the misappropriation of the Company's business opportunities, customer relationships, money, mail, confidential information, and company resources.

139. Specifically, Utley: (a) diverted corporate opportunities belonging to X Strategies for his own personal benefit while serving as an officer of the

Company; (b) used Company funds and resources to establish competing business ventures; (c) contacted X Strategies' customers post-termination and attempted to divert their business to a competing enterprise; (d) solicited Tower Strategy to cease being a Company client and used Tower Strategy to compete against X Strategies; and (e) used X Strategies' confidential business information, trade secrets, and customer relationships to gain an unfair competitive advantage.

140. Utley also used the Company's money to gamble at casinos. He gambled with the Company's money and if he won, he kept the money, but if he lost the Company took the loss. Just in 2025 alone, Utley gambled $29,000,000 of the Company's money at slot machines at a single casino, ultimately losing $3,000,000.

141. The aforementioned conduct constitutes an unconscionable deceptive act or practice in violation of Fla. Stat. § 501.201 *et seq*.

142. Utley's unfair and deceptive acts and practices were likely to, and did in fact, mislead the Company's other owners, employees, and customers.

143. As a direct and proximate result of Utley's violations of FDUTPA, X Strategies has suffered actual damages in an amount to be determined at trial. X Strategies is entitled to recover its actual damages, declaratory and injunctive relief, and reasonable attorney's fees and costs pursuant to Florida Statute § 501.211.

**COUNT VIII**
**UNFAIR COMPETITION**
**(AGAINST DEFENDANT UTLEY)**

144. Plaintiff realleges and incorporates paragraphs 1-92 as if fully set forth herein.

145. Utley engaged in unfair competition against X Strategies through the misappropriation of the Company's business opportunities, customer relationships, confidential information, and company resources.

146. Specifically, Utley: (a) diverted corporate opportunities belonging to X Strategies for his own personal benefit while serving as an officer of the company; (b) used company funds and resources to establish competing business ventures; (c) contacted X Strategies' customers post-termination and attempted to divert their business to a competing enterprise; and (d) used X Strategies' confidential business information, trade secrets, and customer relationships to gain an unfair competitive advantage.

147. Utley's conduct was willful, intentional, and calculated to injure X Strategies and benefit himself at the Company's expense.

148. Utley solicited Tower Strategy to stop being a client of the Company and is using it to compete against the Company.

149. As a direct and proximate result of Utley's unfair competition, X Strategies has suffered damages in an amount to be determined at trial.

**COUNT IX**
**BREACH OF EMPLOYMENT AGREEMENT**
**(AGAINST DEFENDANT UTLEY)**

150. Plaintiff realleges and incorporates paragraphs 1-22 and 63-92 as if fully set forth herein.

151. X Strategies and Utley entered into a valid and enforceable Employment Agreement in connection with Utley's departure from the

company. The Employment Agreement contained, among other provisions, a non-compete clause restricting Utley from competing with X Strategies.

152. Utley materially breached the Employment Agreement by, among other things, contacting X Strategies' customers and soliciting their business for a competing enterprise he was establishing, and actually competing directly with X Strategies using X Strategies' confidential business information.

153. After his termination, Utley solicited Tower Strategy to stop being a client of the Company and is using it to compete against the Company.

154. As a direct and proximate result of Utley's breach of the Employment Agreement, X Strategies has suffered damages in an amount to be determined at trial.

**COUNT X**
**CONVERSION**
**(AGAINST UTLEY AND STARK INDUSTRIES)**

155. Plaintiff realleges and incorporates paragraphs 1-92 as if fully set forth herein.

156. X Strategies had an ownership interest in the funds, assets, and property that Utley and Stark Industries wrongfully took, including but not limited to the funds in X Strategies' bank accounts, business opportunities belonging to X Strategies, and other corporate property.

157. Utley and Stark Industries wrongfully exercised dominion and control over X Strategies' funds and property in a manner inconsistent with X Strategies' ownership rights. Utley and Stark Industries wrongfully withdrew funds from X Strategies' bank accounts, diverted corporate opportunities for his personal benefit, and transferred X Strategies' funds to Stark Industries without

authorization. Utley and Stark Industries wrongfully received and retained X Strategies' funds, knowing that such funds were embezzled from X Strategies.

158. Utley and Stark Industries exercise of dominion and control over X Strategies' property was unauthorized and was inconsistent with X Strategies' rights as owner of the property.

159. As a direct and proximate result of Utley and Stark Industries' conversion, X Strategies has suffered damages in an amount to be determined at trial, but believed to be in excess of $5,000,000.

**COUNT XI**
**IMPOSITION OF CONSTRUCTIVE TRUST**
**(AGAINST ALL DEFENDANTS)**

160. Plaintiff realleges and incorporates paragraphs 1-92 as if fully set forth herein.

161. Defendants obtained funds, assets, investments, and property through their wrongful conduct as set forth herein, including through embezzlement, fraud, breach of fiduciary duty, and diversion of corporate opportunities.

162. Utley, Stark Industries, Weisheimer, and Dicenzo Fitness knowingly received and retained embezzled funds transferred from X Strategies by Utley, its sole owner and controlling person.

163. Defendants would be unjustly enriched if permitted to retain the funds, assets, investments, and property they acquired through their wrongful conduct.

164. X Strategies requests that this Court impose a constructive trust on all assets, funds, investments, and property acquired by Defendants using

embezzled X Strategies funds or diverted corporate opportunities, including but not limited to: (a) funds and assets held by or through Stark Defense Industries; (b) personal investments made with X Strategies' funds; (c) 500,000 shares of Renovaro stock; (d) luxury vehicles, jewelry, and other personal property purchased with embezzled funds; (e) gambling winnings obtained using company funds; (f) assets Utley holds at casinos in the form of points, credits, funds, perks, benefits, rewards, or statuses as a result of how much X Strategies' money he gambled at the casinos; (g) real property or interests in real property acquired with embezzled funds; (h) funds and assets held by or through Dicenzo Fitness; and (i) any other assets traceable to X Strategies' funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff X Strategies, LLC respectfully requests that this Court enter judgment in its favor and against Defendants, and award the following relief:

A. Compensatory damages and special damages in an amount to be determined at trial, but believed to be in excess of $5,000,000;

B. Treble damages pursuant to Florida Statute § 772.11 (Civil Theft);

C. Treble damages pursuant to 18 U.S.C. § 1964(c) (RICO);

D. Disgorgement of all profits, benefits, and proceeds obtained by Utley as a result of his wrongful conduct;

E. Imposition of a constructive trust on all assets, funds, accounts (including at casinos), investments, and property traceable to X Strategies' funds;

F. Temporary, preliminary, and permanent injunctive relief, including an asset freeze (including at casinos) and enforcement of the non-compete provisions of the Employment Agreement;

G. An accounting of all funds, assets (including at casinos), and business opportunities diverted by Utley from X Strategies;

H. Attorney's fees and costs;

I. Pre-judgment and post-judgment interest at the highest rate permitted by law;

J. Punitive damages; and

K. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

X Strategies demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Paul Punzone*
Paul Punzone
Florida Bar No. 1003511
Paul.punzone@hklaw.com
HOLLAND & KNIGHT LLP
100 N. Tampa Street, Suite 4100
Tampa, FL 33602
(813) 227-8500
(813) 229-0134 (fax)

Jordan N. Bittle
Florida Bar No. 1031464
jordan.bittle@hklaw.com
515 E. Las Olas Blvd., St. 1200
Fort Lauderdale, Florida 33301
Tel : (954) 525-1000
Fax : (954) 463-2030

*Attorneys for Plaintiff*