**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**
**Case No. 9:26-cv-81194-EA**

**X STRATEGIES, LLC,**

Plaintiff/Counter-Defendant,

v.

**DEREK UTLEY, STARK DEFENSE INDUSTRIES, INC., ANNA WEISHEIMER, & ANNA DICENZO FITNESS LLC,**

Defendants.
_______________________________________/

**DEREK UTLEY,**

Counter-Plaintiff,

v.

**X STRATEGIES, LLC,**

Counter-Defendant.

_______________________________________/

**DEFENDANTS DEREK UTLEY & STARK DEFENSE INDUSTRIES, INC.'S ANSWER, AFFIRMATIVE DEFENSES & COUNTERCLAIM**

Defendants Derek Utley and Stark Defense Industries, Inc. ("Stark," and collectively, "Defendants") answer the Complaint [D.E. 1] filed by Plaintiff X Strategies, LLC ("X Strategies" or the "Company"), assert affirmative defenses and Utley's Counterclaim against X Strategies.

## PRELIMINARY STATEMENT

The Complaint tells half a story. It never mentions that on April 3, 2026, Bruesewitz, the Company's Chief Executive Officer, and Bruz, his holding company, signed a Confidential Settlement Agreement with Utley, the Company's former chairman, and Stark (the "Settlement Agreement") that resolved the very accusations of misappropriation and theft that the Complaint

now repeats. In exchange for broad releases from Bruesewitz, Bruz, and their "affiliates," "subsidiaries," and "any person or entity who can make a claim on" their behalf, Stark transferred its entire 50% ownership interest in X Strategies to Bruz, for no cash. The Settlement Agreement was drafted by Holland & Knight, the same law firm that now represents X Strategies in this action, and the same law firm that had for years advised Utley personally as well as the Company he co-owned and chaired.[1] Five and a half months after Bruz took 100% of the Company, X Strategies filed this action making personal attacks on Utley and his company, Stark Defense Industries, in an effort to relitigate the released accusations, inflate them, and attach them to a bare-bones and meritless civil RICO count. The Complaint was then widely circulated to the press with the obvious intent of harming Utley personally and professionally. Defendants deny the material allegations of the Complaint and seek relief for the harm this action and its publicity were designed to cause. This is a marketing ploy masquerading as a federal lawsuit.

Moreover, the Complaint presents a deliberately selective account of the parties' financial dealings, accusing Utley of concealing transactions, misappropriating corporate opportunities, and enriching himself at the Company's expense while omitting substantial evidence that Bruesewitz and other Company principals engaged in comparable conduct. As detailed below, Bruesewitz personally received substantial compensation and equity benefits arising from Company relationships, diverted business opportunities through separately controlled entities, and participated in financial arrangements that were never adequately disclosed to Utley. These matters further undermine the Complaint's allegations and support Defendants' affirmative defenses, including unclean hands and i*n pari delicto*.

---

[1] This Answer is filed without waiver of Defendants' putative motion for disqualification.

## FACTUAL BACKGROUND

i. This action is not simply a dispute concerning the financial management of X Strategies, LLC ("X Strategies" or the "Company"). It is an attempt by Alexander Bruesewitz ("Bruesewitz"), the Company's co-founder and Chief Executive Officer, to weaponize the judicial process against Derek Utley ("Utley"), his former equal business partner and now a competitor. The Complaint advances a deliberately one-sided account of the parties' relationship, portraying Bruesewitz as an unsuspecting and financially disinterested executive who entrusted the Company's affairs entirely to Utley, while accusing Utley of dishonesty, financial impropriety, and the diversion of corporate assets and opportunities. That narrative conceals Bruesewitz's own extensive financial dealings, undisclosed compensation arrangements, and diversion of valuable business opportunities for his personal benefit. Indeed, much of the misconduct the Complaint attributes to Utley mirrors conduct in which Bruesewitz himself engaged.

ii. The allegations that follow concerning Bruesewitz's financial dealings, undisclosed compensation arrangements, diversion of corporate opportunities, and other misconduct are directly relevant to the claims and defenses in this action, including Defendants' affirmative defense of unclean hands and in pari delicto. Through that defense, Defendants contend that X Strategies, acting through Bruesewitz and its other principals, cannot obtain equitable relief for alleged financial improprieties and misappropriation of corporate assets and opportunities while concealing or disregarding its own participation in, knowledge of, and responsibility for substantially similar conduct. These allegations are not offered merely to challenge Bruesewitz's character. Rather, they demonstrate the selective nature of the Complaint's accusations, rebut its portrayal of Bruesewitz as an uninvolved and financially disinterested executive, and establish the

factual basis for Defendants' contention that X Strategies does not come before the Court with clean hands.

iii. Utley and Bruesewitz founded X Strategies in or about 2017, each holding a fifty-percent ownership interest through their respective entities. Although Utley principally oversaw the Company's internal financial and administrative operations, Bruesewitz, as Chief Executive Officer, exercised substantial authority over its sales, client relationships, business development, personnel, and commercial engagements. He negotiated directly with customers, determined the terms of significant business relationships, and exercised independent control over revenue-generating opportunities. The Complaint's repeated assertions that Utley maintained exclusive control over the Company's finances, banking accounts, financial records, and business systems are therefore materially misleading insofar as they suggest that Bruesewitz lacked knowledge of, access to, or involvement in significant financial transactions. Bruesewitz was not a passive observer of the Company's financial affairs. He was an active participant in substantial commercial transactions, including transactions from which he personally profited and which he failed to disclose or properly account for to his equal business partner, Utley.

iv. Particularly revealing is the Complaint's gratuitous portrayal of Bruesewitz as a man who was not motivated by wealth, resisted the temptation to elevate his lifestyle, and embraced his religious faith through baptism. (Compl. ¶ 23.) These self-serving characterizations have no legitimate bearing on the financial claims asserted against Utley and serve principally to create a false contrast between the parties' purported character and motivations. More importantly, they are contradicted by Bruesewitz's own conduct. While professing financial restraint and personal integrity, Bruesewitz pursued substantial undisclosed compensation arrangements, accepted valuable personal financial benefits, and exploited business relationships developed

through X Strategies to enrich himself at the expense of the Company and Utley. Bruesewitz's invocation of his religious faith does not insulate his financial dealings from scrutiny or excuse his breaches of the duties he owed to his business partner.

**Bruesewitz's Misappropriation of PublicSquare Equity & Corporate Opportunities**

v. One particularly significant example of Bruesewitz's misconduct involves PSQ Holdings, Inc., doing business as PublicSquare ("PublicSquare"), a publicly traded company listed on the New York Stock Exchange under the ticker symbol PSQH. PublicSquare became an X Strategies client through a business relationship involving Utley, Bruesewitz, and Michael Seifert ("Seifert"), who subsequently served as PublicSquare's Chief Executive Officer. X Strategies provided PublicSquare with strategic communications, social media promotion, and marketing services, including a highly successful campaign concerning Target Corporation that generated substantial publicity and hundreds of thousands of new users for PublicSquare. The PublicSquare relationship was an established and valuable corporate engagement, not a personal business opportunity belonging exclusively to Bruesewitz.

vi. In connection with PublicSquare's transition to a publicly traded company in July 2023, substantial equity compensation was arranged in consideration of the business relationship and services provided by X Strategies. Although the equity was attributable to an opportunity developed through X Strategies, Seifert proposed allocating the shares directly to the Company's two equal owners rather than to X Strategies itself, purportedly to avoid administrative complications. Seifert repeatedly represented that the shares would be allocated equally between Utley and Bruesewitz. Bruesewitz likewise assured Utley that they had received equal allocations. Those representations were false. Bruesewitz received approximately 160,000 shares of

PublicSquare stock, while Utley received only approximately 30,000 shares, notwithstanding their equal ownership interests and the corporate origin of the opportunity.

vii. The disparity was substantial. Contemporaneous communications in July and August 2023 reflected approximately $1.6 million in restricted stock units ("RSUs") awarded to Bruesewitz, compared with approximately $300,000 in RSUs awarded to Utley. Upon discovering the discrepancy, Utley repeatedly challenged Seifert concerning the unequal allocation and questioned why equity compensation arising from an X Strategies business relationship had been awarded to individuals rather than to the Company. Despite those objections, the disparity was never satisfactorily explained or corrected. Bruesewitz thereby secured for himself a disproportionate share of a valuable corporate opportunity, depriving Utley of the corresponding economic benefits to which he was entitled as an equal owner. The transaction is particularly telling given the Complaint's accusation that Utley diverted Company funds into personal investments and retained the resulting financial benefits. In the PublicSquare transaction, it was Bruesewitz who obtained a substantial personal equity award at Utley's expense.

viii. Bruesewitz's diversion of the PublicSquare relationship did not end with the equity allocation. In or about December 2024, PublicSquare discontinued its existing retainer agreement with X Strategies. PublicSquare's Chief Financial Officer subsequently advised that an outstanding X Strategies invoice should not be paid because a new contractual arrangement was being negotiated. Rather than transparently negotiating a replacement agreement for the Company, Bruesewitz arranged to receive substantial compensation directly from PublicSquare. Beginning in or about January 2025, Bruesewitz received approximately $20,000 to $25,000 per month from PublicSquare, payments that continued until approximately May 2026. Throughout this period, Bruesewitz continued to use X Strategies' computer systems and other Company

resources in connection with the services for which he was being compensated personally. These arrangements were not adequately disclosed to Utley, who remained a fifty-percent owner of X Strategies during the relevant period.

ix. The sequence of transactions is unmistakable: PublicSquare, an established X Strategies client, terminated its corporate retainer; its representatives referred to a replacement arrangement; and Bruesewitz thereafter began receiving substantial recurring compensation personally from that same client. Bruesewitz deliberately redirected business and revenue properly attributable to X Strategies into a personal compensation arrangement, thereby depriving the Company and Utley of substantial economic benefits. This conduct directly contradicts the Complaint's assertion that Utley was the partner who misappropriated corporate opportunities and concealed financial transactions. It also undermines the Complaint's portrayal of Bruesewitz as an executive who remained removed from financial matters and was unaware of significant transactions affecting the Company.

x. Seifert's subsequent involvement in X Strategies further exposes the selective and misleading nature of the Complaint. Seifert, who was directly involved in the unequal allocation of PublicSquare equity to Bruesewitz and Utley, resigned as President and Chief Executive Officer of PublicSquare in January 2026 and thereafter joined X Strategies as its President. Thus, the same individual who participated in transactions through which Bruesewitz received substantial personal financial benefits from an X Strategies client subsequently assumed a senior executive position at X Strategies and is now portrayed in the Complaint as having uncovered Utley's supposed financial misconduct. Conspicuously absent from that account is any meaningful disclosure of Seifert's own involvement in the PublicSquare equity allocation, Bruesewitz's subsequent personal compensation arrangement, or the diversion of economic benefits from X

Strategies. Moreover, the circumstances surrounding these transactions raise serious questions concerning the accuracy and completeness of PublicSquare's public filings, including whether the substantial restricted stock unit awards and subsequent personal compensation arrangements benefiting Bruesewitz were properly accounted for and disclosed in accordance with applicable securities laws and financial reporting requirements. These matters are particularly significant given the Complaint's accusations that Utley concealed financial transactions, misappropriated corporate opportunities, and engaged in a sustained campaign of deceit.

**Additional Undisclosed Compensation & Diversion of Business Opportunities**

xi. The PublicSquare transactions were not isolated. Bruesewitz also negotiated separate arrangements involving other business contacts and entities whose needs fell squarely within X Strategies' established consulting and strategic communications business. Among other things, Bruesewitz entered into a communications-services arrangement with 1789 Capital providing for approximately $150,000 in annual compensation, payable in quarterly installments. Rather than consistently conducting these engagements through X Strategies' ordinary billing and accounting systems, Bruesewitz utilized email accounts and business entities under his separate control. Upon information and belief, these arrangements enabled Bruesewitz to retain compensation for services and opportunities that properly belonged to X Strategies, without disclosure to or authorization from Utley.

xii. Bruesewitz's financial dealings reveal a recurring practice of exploiting the Company's established client relationships, business contacts, and consulting capabilities while treating the resulting compensation as his own. As the executive principally responsible for business development and client relationships, Bruesewitz was uniquely positioned to determine whether a particular engagement would be pursued through X Strategies or redirected to himself

or a separately controlled entity. He used that position to secure substantial personal benefits without adequately accounting for the revenues, contractual rights, and business opportunities that belonged to the Company. His conduct was inconsistent with the duties of loyalty, good faith, and fair dealing owed to X Strategies and its other equal owner, Utley.

**Michael Seifert's Involvement & the Complaint's Selective Financial Narrative**

xiii. The Complaint's reliance upon Seifert as the executive who supposedly uncovered Utley's financial misconduct is equally misleading. (Compl. ¶¶ 52–64.) Although the Complaint identifies Seifert only as the former Chief Executive Officer of an unnamed publicly traded company, that company was PublicSquare, the same entity involved in the disputed equity allocations and subsequent personal compensation arrangements benefiting Bruesewitz. Seifert was not a disinterested outsider who entered X Strategies without prior involvement in the parties' financial affairs. He had participated directly in the PublicSquare business relationship and the allocation of equity that disproportionately benefited Bruesewitz, notwithstanding repeated representations that Utley and Bruesewitz would receive equal shares.

xiv. Seifert resigned as PublicSquare's Chief Executive Officer and director on January 27, 2026, and subsequently assumed a leadership position at X Strategies. Upon information and belief, Seifert possessed direct knowledge of the circumstances surrounding the PublicSquare equity distributions, the termination of the Company's retainer, and the separate compensation arrangements benefiting Bruesewitz. Yet the Complaint conspicuously omits those transactions while presenting Seifert's examination of the Company's finances as an independent and comprehensive investigation. That selective presentation is especially significant because the Complaint relies upon Seifert's purported findings to accuse Utley of improperly receiving

distributions and other financial benefits while ignoring substantial compensation and equity interests received by Bruesewitz outside the Company's ordinary accounting.

xv. Indeed, the Complaint alleges that Seifert determined certain payments to Utley could not constitute legitimate distributions because comparable payments were not made to Bruesewitz. (Compl. ¶ 61.) That assertion ignores the substantial equity, direct compensation, and other economic benefits Bruesewitz received independently of X Strategies, including benefits arising from existing Company relationships. Any meaningful accounting of the parties' respective financial interests must consider not only funds disbursed from X Strategies' bank accounts, but also revenues, equity interests, contractual opportunities, and other compensation attributable to the Company's business that Bruesewitz retained personally. The Complaint's failure to account for those benefits renders its portrayal of the parties' respective financial dealings materially incomplete.

**Bruesewitz's Foreign Financial Relationships & Undisclosed Personal Benefits**

xvi. Upon information and belief, Bruesewitz also pursued substantial business and financial relationships with foreign individuals, investors, and governmental representatives, including persons associated with Qatar, the United Arab Emirates, and Syria. These relationships were developed while Bruesewitz served as X Strategies' Chief Executive Officer and exercised control over the Company's political consulting, strategic communications, and business-development activities. The relationships and access Bruesewitz cultivated through X Strategies were valuable commercial assets, particularly to foreign interests seeking introductions to American political figures, access to governmental institutions, or assistance advancing their commercial and political objectives. Upon information and belief, Bruesewitz exploited those

relationships to obtain substantial personal compensation and benefits that were neither fully disclosed to Utley nor properly accounted for as potential Company revenue.

xvii. Upon information and belief, Bruesewitz received approximately $500,000 from individuals associated with Qatar in connection with an undisclosed business or consulting arrangement. Information concerning that payment was communicated to political consultant Alex deGrasse by individuals associated with Qatar and subsequently became the subject of questions concerning Bruesewitz's public denials that he had received compensation from Qatari sources. Utley was unaware of the transaction at the time and was never provided with contracts, invoices, accounting records, or other documentation explaining its nature or purpose. The reported payment and Bruesewitz's public denials raise substantial questions concerning the transparency of his foreign financial dealings and stand in stark contrast to the Complaint's portrayal of Bruesewitz as an individual of unimpeachable honesty and integrity who was supposedly unaware of significant financial transactions.

xviii. Bruesewitz's dealings with foreign interests extended beyond the reported Qatari payment. Upon information and belief, Bruesewitz cultivated relationships with foreign governmental representatives, politically connected individuals, and wealthy foreign businessmen while offering political consulting, strategic communications, and access to American political figures and governmental institutions. These activities raise serious questions concerning whether Bruesewitz was acting at the request or direction of foreign principals in connection with political consulting, public relations, or efforts to influence American governmental decision-making, and whether his activities triggered registration and disclosure obligations under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611–621. The distinction is significant because FARA may require disclosure not merely of the identity of a foreign principal, but also of the nature of

the services performed, compensation received, and activities undertaken on that principal's behalf. Upon information and belief, Bruesewitz pursued these foreign relationships and financial arrangements independently, without Utley's participation, involvement, or contemporaneous knowledge. The Complaint makes no mention of these activities while accusing Utley of concealing financial transactions and engaging in a sustained pattern of deceit.

xix. Bruesewitz also received substantial personal benefits from wealthy businessmen of Syrian origin. When Utley questioned the extraordinary expense of Bruesewitz's luxury honeymoon accommodations, Bruesewitz acknowledged that he had not personally paid for them and stated that two Syrian billionaires had covered the expense. Upon information and belief, those individuals included Moutaz Al-Khayyat, who provided Bruesewitz with complimentary accommodations, including access to an exceptionally expensive hotel suite ordinarily commanding approximately $15,000 per night. Notably, Bruesewitz spent his honeymoon at the Waldorf Astoria Maldives Ithaafushi, a luxury resort developed by a company controlled by the Al-Khayyat family and constructed by their Qatar-based construction business, UCC Holding. Far from keeping this lavish experience private, Bruesewitz publicly displayed photographs of his honeymoon on Instagram, including images of the couple posing on pristine beaches and enjoying an elaborate, flower-adorned beachfront dinner, while expressly thanking the Waldorf Astoria Maldives for its "incredible hospitality." In June 2026, political commentator Evi Kokalari publicly questioned Bruesewitz about his accommodations at the resort, stated that she had seen photographs of him with members of the Al-Khayyat family, and challenged him to produce receipts demonstrating that he had personally paid for his stay.

xx. Significantly, Moutaz Al-Khayyat, his brother Ramez Al-Khayyat, and their Qatar-based construction company, Urbacon Trading and Contracting ("UCC"), are named defendants

in a federal civil action filed in September 2026 in the United States District Court for the Southern District of California, *Shoufan et al. v. Al-Khayyat et al.*, No. 3:26-cv-05548. That action, brought under the federal Anti-Terrorism Act, 18 U.S.C. § 2333, by American nationals who suffered injuries or lost family members in terrorist attacks in Syria, alleges that the Al-Khayyat brothers knowingly provided tens of millions of dollars and weapons to al-Qaeda in Iraq, the Al-Nusra Front, and ISIS. The complaint further alleges that the brothers used their construction businesses and Qatari bank accounts to facilitate the transfer of funds to terrorist organizations operating in Syria.

xxi. The accommodations and other benefits furnished to Bruesewitz by Al-Khayyat, among others, represented substantial personal economic value and, upon information and belief, arose from his relationships with foreign business interests seeking to benefit from his political and commercial connections. These substantial noncash benefits also raise questions concerning their proper treatment for federal income tax purposes, including whether their fair market value constituted taxable compensation that Bruesewitz was required to report to the Internal Revenue Service. Such conduct further contradicts the Complaint's carefully constructed portrayal of Bruesewitz as someone indifferent to wealth and resistant to an extravagant lifestyle.

**Bruesewitz's Separate International Business Ventures**

xxii. Bruesewitz further pursued lucrative international business opportunities through a separately organized entity, ABIH LLC ("ABIH"), also identified as Alex Bruesewitz International Holdings, formed in February 2026. In March 2026, ABIH prepared a detailed advisory services proposal for Norleo Investment Group ("Norleo"), a Copenhagen-based investment firm with holdings in the United States and Europe. The proposal contemplated an annual advisory fee of $1 million, payable in equity interests in Norleo portfolio companies, together with a success fee

equal to one percent of the value of investment, divestiture, or partnership transactions facilitated by ABIH. The proposed services included identifying investment opportunities, introducing investors and strategic partners, facilitating cross-border transactions, and providing access to American governmental officials, federal agencies, and financial institutions.

xxiii. Significantly, Seifert, while working for X Strategies, prepared the Norleo proposal using his Company-provided email account and transmitted it to Bruesewitz's personal email address rather than through X Strategies' ordinary business channels. Seifert also established unauthorized Microsoft Exchange email accounts to conduct communications outside the Company's ordinary Google email system. Upon information and belief, Bruesewitz and Seifert deliberately used a separately controlled entity and alternative communications channels to conceal their activities from Utley, thereby preventing him from discovering and asserting X Strategies' interests in potentially lucrative business opportunities and/or identifying and reporting conduct that could violate federal law.

xxiv. The Norleo proposal is particularly significant because the services ABIH offered substantially overlapped with X Strategies' political consulting, strategic communications, and business-development activities. Had these opportunities been disclosed, Utley could have evaluated their potential value to the Company and ensured that any resulting engagements complied with applicable legal requirements, including obtaining necessary registrations or approvals. Instead, Bruesewitz and Seifert pursued them through ABIH, which proposed identifying investment opportunities, introducing investors, and facilitating investment transactions in exchange for substantial compensation, including a success fee tied to completed deals. Such activities, when involving securities, implicate the broker-dealer registration requirements of Section 15(a) of the Securities Exchange Act of 1934, raising substantial questions

concerning whether ABIH engaged in unregistered brokerage activity in violation of federal securities laws.

xxv. The Norleo proposal also offered access to federal and congressional officials and assistance with governmental agencies on behalf of a foreign investment firm. X Strategies' communications identified calendar entries reflecting meetings scheduled for Bruesewitz with the Export-Import Bank of the United States. These circumstances raise questions concerning potential registration and disclosure obligations under FARA. Upon information and belief, Bruesewitz pursued these opportunities for his personal benefit without adequately disclosing them to Utley or accounting for X Strategies' economic interests. His conduct directly contradicts the Complaint's portrayal of Bruesewitz as uninvolved in substantial financial transactions and further supports Defendants' affirmative defense of unclean hands.

**The Complaint's Improper Purpose and Selective Accusations**

xxvi. Against this background, the Complaint's sweeping accusations of dishonesty, concealed financial transactions, personal enrichment, and misappropriation of corporate opportunities are particularly disingenuous. Bruesewitz seeks to portray Utley as the sole source of the Company's purported financial irregularities while concealing his own substantial personal compensation arrangements, disproportionate equity benefits, foreign financial relationships, and diversion of business opportunities. The Complaint's repeated attacks on Utley's personal character, lifestyle, and integrity do not cure those omissions. Rather, they underscore the extent to which this action has been framed as a personal attack upon Utley instead of a balanced examination of the parties' business relationship and financial dealings.

xxvii. The timing and nature of the Complaint are likewise significant. Following the deterioration of the parties' business relationship and Utley's departure from X Strategies, Utley

became associated with Tower Strategy, a business that X Strategies views as a competitor. The Complaint devotes considerable attention to Utley's alleged competitive activities, accusing him of stealing customers and corporate opportunities, while omitting Bruesewitz's own diversion of established Company relationships and valuable business opportunities. The Complaint also alleges that Utley is subject to a contractual non-competition restriction, D.E. 1. ¶151, when the non-competition agreement itself places no restriction on Utley's post-separation competition. D.E. 1-1, p. 6. Upon information and belief, Bruesewitz has used this litigation not merely to pursue purported corporate claims, but also to retaliate against a former business partner who X Strategies views as competition, damage Utley's professional reputation, and impair his ability to compete in the marketplace.

xxviii. The Complaint's selective accusations also obscure the financial interests of X Strategies itself. Any legitimate examination of the Company's financial affairs must include the substantial compensation, equity interests, contractual rights, and business opportunities that Bruesewitz obtained outside the Company's ordinary accounts. It must also account for the involvement of Seifert, whose participation in the PublicSquare transactions and subsequent association with X Strategies place him in a position of direct knowledge concerning material transactions omitted from the Complaint. Bruesewitz cannot properly attribute the Company's purported financial losses exclusively to Utley while excluding from scrutiny the economic benefits Bruesewitz obtained for himself through the Company's business relationships.

xxix. Ultimately, the Complaint illustrates the familiar principle that those who live in glass houses should not throw stones. Bruesewitz has accused Utley of the very types of conduct in which Bruesewitz himself engaged, including concealing financial arrangements, exploiting Company relationships for personal gain, and diverting valuable business opportunities from X

Strategies and its other owner. His attempt to cast himself as an innocent victim while attacking Utley's honesty and integrity is contradicted by his own financial dealings. Utley denies the Complaint's accusations of embezzlement, fraud, money laundering, and misappropriation and maintains that the claims asserted against him must be considered in light of Bruesewitz's conduct, the financial benefits Bruesewitz personally obtained, and the substantial economic interests of which Utley was deprived.

## ANSWER

Derek Utley and Stark Industries deny all accusations and deny liability in full. Except as expressly admitted below, Defendants deny each and every allegation of the Complaint, including any allegations contained in headings, footnotes, unnumbered paragraphs, and the prayer for relief. Where Defendants state that they are without knowledge, the allegation is denied on that basis. To the extent an allegation is directed solely to Defendants Anna Weisheimer or Anna Dicenzo Fitness LLC, no response from Defendants is required; to the extent a response is required, Defendants deny such allegations as they relate to Defendants and are otherwise without knowledge. Where Defendants refer to a document, the document speaks for itself, and Defendants deny any characterization inconsistent with its terms.

### Introduction

1. Admitted that X Strategies is a social media strategy and consulting firm with its principal place of business in Palm Beach County, Florida. Defendants are without knowledge as to the remaining allegations, which describe the Company's current business, and therefore deny them.

2. Admitted that Utley formerly served as Chairman of X Strategies, until April 3, 2026, otherwise denied.

3. Denied.

4. Denied.

5. Denied.

6. Denied.

**The Parties**

7. Admitted that X Strategies is a limited liability company with its principal place of business in Palm Beach County, Florida, and further state that, according to its formation documents, X Strategies is a Delaware limited liability company. X Strategies is a wholly owned subsidiary of The Bruz Corporation, which itself is wholly owned by Alex Bruesewitz. Defendants are without knowledge as to the remaining characterizations of the Company's business and therefore deny them.

8. Admitted that Utley resides in Palm Beach County, Florida, and that Utley is the former Chairman of X Strategies, otherwise denied.

9. Admitted that Stark is a Florida corporation with its principal place of business in Palm Beach County, Florida, and that Stark is wholly owned by Utley. Admitted that Stark formerly owned a 50% membership interest in X Strategies, which Stark transferred to Bruz on April 3, 2026, pursuant to the Settlement Agreement. The remaining allegations are denied.

10. Admitted that Anna Dicenzo Fitness LLC is a Florida limited liability company, otherwise denied.

11. Admitted upon information and belief.

**Jurisdiction and Venue**

12. Admitted only that Plaintiff purports to bring the claims described. Denied that Plaintiff is entitled to any relief.

13. Admitted only that Plaintiff purports to seek an amount in excess of $75,000. Denied that Plaintiff is entitled to any recovery.

14. Admitted only that Plaintiff invokes 28 U.S.C. § 1331 on the basis of Count V. Denied that Count V states a claim under 18 U.S.C. § 1962. Defendants reserve all rights with respect to the sufficiency of Count V and the Court's exercise of jurisdiction under 28 U.S.C. § 1367(c).

15. Admitted only that Plaintiff invokes 28 U.S.C. § 1367(a). The remaining allegations are denied.

16. Admitted that venue is proper in this District. Defendants further state that the Settlement Agreement provides for exclusive venue in Palm Beach County, Florida. Denied that any events or omissions giving rise to a valid claim against Defendants occurred.

**General Allegations**

17. Admitted that X Strategies was formed in 2017 and was founded by Utley and Bruesewitz. Denied that the ownership allegations are complete or accurate. As recited in the Settlement Agreement, Utley and Bruesewitz initially each owned 49.5% of the Company's membership interests and Vernon Stowe owned 1.0%; Stowe later transferred his interest equally to Utley and Bruesewitz, after which Utley transferred his 50% interest to Stark and Bruesewitz transferred his 50% interest to Bruz. The remaining allegations are denied.

18. Admitted that Utley served as Chairman of X Strategies from 2017 until April 3, 2026. The remaining allegations are denied.

19. Admitted that Bruesewitz served as Chief Executive Officer of X Strategies and was responsible for sales, client services, and the management of the Company's employees and independent contractors. The remaining allegations are denied.

20. Admitted that the Company's revenues and reputation grew, which Defendants attribute to the efforts of both founders. The remaining allegations are denied.

21. Admitted that the Company relocated its headquarters to the West Palm Beach area in or about 2019. Defendants are without knowledge as to the stated reasons and therefore deny the remaining allegations.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

36. Denied.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Admitted that X Strategies engaged Michael Seifert in 2026 and that Seifert was acquainted with Utley and Bruesewitz. Defendants are without knowledge as to the remaining allegations and therefore deny them.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Defendants are without knowledge as to communications between Seifert and Bruesewitz and therefore deny the allegations of paragraph 57.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Denied.

64. Defendants are without knowledge as to communications between Seifert and Bruesewitz and therefore deny them. The remaining allegations are denied.

65. Admitted only that on April 3, 2026, Stark transferred its 50% membership interest in X Strategies to Bruz and Utley resigned as a member, manager, and officer of X Strategies. Denied that this paragraph accurately or completely describes what occurred. The transfer and the resignation were made pursuant to, and as the consideration for, the Settlement Agreement among Utley, Stark, Bruesewitz, and Bruz, which Holland & Knight drafted and which contains a mutual release of all claims through April 3, 2026. The Complaint omits any reference to the Settlement Agreement. The remaining allegations are denied.

66. Denied as phrased. Admitted only that, under a written Employment Agreement effective April 3, 2026, which was Exhibit B to the Settlement Agreement, X Strategies employed Utley as "Chairman Emeritus and Executive Advisor to the CEO" for a one-year Initial Term at an annual salary of $180,000 plus commissions. Denied that Utley's employment was "temporary," was subject to "tight restrictions and expectations," or was conditioned on any treatment program. The Employment Agreement contains no such terms and supersedes all prior negotiations and understandings. The remaining allegations are denied.

67. Admitted that Section 4(b) of the Employment Agreement describes Utley's duties, and Defendants refer to that document for its terms. Any characterization inconsistent with the document is denied.

68. Denied. The Employment Agreement contains no in-office requirement and provides that Utley's schedule would be "consistent with the schedule of days and hours customary in the media consulting industry for a Chairman Emeritus and Executive Advisor to the CEO."

69. Denied.

70. Denied.

71. Denied.

72. Admitted only that Seifert spoke with Utley about his availability after Utley's injury. The remaining allegations are denied.

73. Admitted that Utley informed Seifert that he had been injured in a motor vehicle collision while riding as a passenger in an Uber, and that medical appointments had to be attended during normal working hours. The remaining allegations are denied.

74. Denied.

75. Denied.

76. Admitted that Seifert requested documentation. The remaining allegations are denied.

77. Denied as phrased.

78. Admitted only that Utley provided X Strategies with medical records he received in connection with his treatment. Denied that any record was fabricated, altered, or forged by Utley.

79. Defendants are without knowledge as to any communications between Seifert and Radius TBI of South Florida and therefore deny them. Denied that the records Utley provided were fake.

80. Denied.

81. Admitted as to X Strategies purported reason for termination.

82. Admitted that X Strategies and Utley entered into the Employment Agreement, effective April 3, 2026, and that a copy is attached to the Complaint as Exhibit A. Defendants further state that the Employment Agreement was Exhibit B to the Settlement Agreement, which Plaintiff did not attach. Denied that the Employment Agreement "governed" any termination of Utley, who resigned. The remaining allegations are denied.

83. Denied. The Employment Agreement contains no post-employment covenant not to compete. Its only non-competition covenant, Section 8(d), applies by its terms solely "during Employee's employment with the Company." The provision quoted in paragraph 83 is a non-solicitation covenant, not a non-compete, and it does not restrict Utley from working for any person or entity.

84. Denied.

85. Denied.

86. Denied.

87. Denied.

88. Admitted only that Utley is employed by Tower Strategy in West Palm Beach, Florida. Denied that Utley solicited Tower Strategy to cease being a client of X Strategies, and denied that Utley provided Tower Strategy with any confidential information of X Strategies. The remaining allegations are denied.

89. Denied.

90. Denied.

91. Defendants are without knowledge as to whether or when X Strategies engaged Vessel Advisors, or the scope or status of any audit, and therefore deny those allegations. Denied that Utley embezzled any amount from X Strategies.

92. Denied.

**Count I (Breach of Fiduciary Duty)**

93. Defendants restate and incorporate their responses to paragraphs 1 through 68 and 91 through 92.

94. Admitted only that, while he served as Chairman, Utley owed X Strategies those duties imposed by applicable law as modified by the Company's Operating Agreement. Denied that Utley owed any fiduciary duty to X Strategies after April 3, 2026. The remaining allegations are denied.

95. Denied.

96. Denied.

97. Denied.

**Count II (Civil Theft)**

98. Defendants restate and incorporate their responses to paragraphs 1 through 68 and 84 through 92.

99. Denied.

100. Denied.

101. Denied.

102. Denied. X Strategies did not serve the written pre-suit demand required by section 772.11(1), Florida Statutes, before filing this action.

103. Denied.

**Count III (Fraudulent Misrepresentation)**

104. Defendants restate and incorporate their responses to paragraphs 1 through 41, 52 through 63, and 91 through 92.

105. Denied.

106. Denied.

107. Denied.

108. Denied.

109. Denied.

110. Denied.

**Count IV (Negligent Misrepresentation)**

111. Defendants restate and incorporate their responses to paragraphs 1 through 41, 52 through 63, and 91 through 92.

112. Denied.

113. Denied.

114. Denied.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

**Count V (Civil RICO, 18 U.S.C. § 1962(c))**

119. Defendants restate and incorporate their responses to paragraphs 1 through 92.

120. Denied.

121. Denied.

122. Denied.

123. Denied.

124. Denied.

125. Denied.

**Count VI (Unjust Enrichment)**

126. Defendants restate and incorporate their responses to paragraphs 1 through 68 and 84 through 92.

127. Denied.

128. Denied.

129. Denied.

130. Denied as to Defendants.

131. Denied.

132. Admitted only that X Strategies paid distributions to Stark as a member of the Company, as it did to Bruz. The remaining allegations are denied.

133. Denied.

134. Denied.

135. Denied.

136. Denied.

**Count VII (Florida Deceptive and Unfair Trade Practices Act)**

137. Defendants restate and incorporate their responses to paragraphs 1 through 92.

138. Denied.

139. Denied.

140. Denied.

141. Denied.

142. Denied.

143. Denied.

**Count VIII (Unfair Competition)**

144. Defendants restate and incorporate their responses to paragraphs 1 through 92.

145. Denied.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

**Count IX (Breach of Employment Agreement)**

150. Defendants restate and incorporate their responses to paragraphs 1 through 22 and 63 through 92.

151. Admitted only that X Strategies and Utley entered into the Employment Agreement in connection with the Settlement Agreement. The remaining allegations are denied.

152. Denied.

153. Denied.

154. Denied.

**Count X (Conversion)**

155. Defendants restate and incorporate their responses to paragraphs 1 through 92.

156. Denied.

157. Denied.

158. Denied.

159. Denied.

**Count XI (Constructive Trust)**

160. Defendants restate and incorporate their responses to paragraphs 1 through 92.

161. Denied.

162. Denied.

163. Denied.

164. Denied.

**Prayer for Relief**

Defendants deny that Plaintiff is entitled to any of the relief requested in the unnumbered "Prayer for Relief," including subparagraphs A through K. Plaintiff's jury demand requires no response. Defendants note that Utley waived a jury trial for actions arising under the Employment Agreement (Section 16) and that the parties to the Membership Interest Purchase Agreement waived a jury trial for actions arising under that agreement (Section 6.8(b)), and Defendants reserve the right to seek appropriate relief with respect to Plaintiff's jury demand.

**AFFIRMATIVE DEFENSES**

Without assuming any burden of proof that would otherwise rest on Plaintiff, Defendants assert the following affirmative defenses. Defendants incorporate by reference the Factual Background set forth above, together with the factual allegations of their Counterclaim below, to the extent relevant to each defense.

//

//

**FIRST DEFENSE**

**(Failure to State a Claim)**

The Complaint, in whole and as to each Count, fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**

**(Release)**

X Strategies' claims are barred, in whole or in part, by release. On or about April 3, 2026, Utley (individually and on behalf of Stark Industries) and Alexander Bruesewitz ("Bruesewitz") (individually and on behalf of The Bruz Corporation ("Bruz")) executed a Confidential Settlement Agreement (the "Settlement Agreement"). Under Section 5.2, Bruesewitz and Bruz—including their "affiliates, parent companies, subsidiaries, owners, agents, executives, assigns, heirs, and any person or entity who can make a claim on Bruesewitz and/or Bruz's behalf"—released and forever discharged Utley and Stark Industries from "any and all damages, causes of action, claims, debts, or liabilities of any kind that have been made or could have been made ... whether known or unknown, from the beginning of time through the ... Effective Date" of April 3, 2026.

By the Effective Date, Bruz owned 100% of X Strategies, making X Strategies a subsidiary and affiliate of Bruz and a person or entity that could assert claims on Bruz's behalf. X Strategies therefore falls within the defined class of releasing parties. Even before the Effective Data, X Strategies was a partially owned subsidiary and an affiliate of X Strategies. Every Count of the Complaint premised on conduct alleged to have occurred on or before April 3, 2026 is barred by the release.

//

//

**THIRD DEFENSE**

**(Accord and Satisfaction)**

X Strategies' claims are barred, in whole or in part, by accord and satisfaction. The disputes underlying this action—including Bruesewitz's and Bruz's accusations that Utley and Stark Industries engaged in "misappropriation, civil theft, embezzlement, and fraud"—were resolved through the Settlement Agreement and the contemporaneous Membership Interest Purchase Agreement, under which Stark Industries transferred its entire 50% membership interest in X Strategies to Bruz in full settlement of those claims. That exchange was given and accepted in satisfaction of the claims now asserted.

**FOURTH DEFENSE**

**(Waiver)**

X Strategies' claims are barred, in whole or in part, by waiver. Bruesewitz and Bruz possessed actual or constructive knowledge of the facts underlying the claims asserted in the Complaint at the time they executed the Settlement Agreement, as the Agreement's recitals confirm the parties had already accused Utley and Stark Industries of misappropriation, civil theft, embezzlement, and fraud. By entering into the Settlement Agreement and accepting Stark Industries' ownership interest while possessing that knowledge, the releasing parties intentionally relinquished the claims now asserted.

**FIFTH DEFENSE**

**(Estoppel)**

X Strategies' claims are barred, in whole or in part, by the doctrine of estoppel. Having obtained Stark Industries' 50% membership interest and Utley's resignation through the Settlement

Agreement, and having represented that those claims were resolved, X Strategies and its controlling owner are estopped from asserting the released claims against Defendants.

**SIXTH DEFENSE**

**(Ratification)**

X Strategies' claims are barred, in whole or in part, by ratification. The transactions and distributions of which X Strategies complains were known to, acquiesced in, and ratified by X Strategies and its principals.

**SEVENTH DEFENSE**

**(Statute of Limitations)**

X Strategies' claims are barred, in whole or in part, by the applicable statutes of limitations and repose, including Fla. Stat. § 95.11, which prescribes a four-year limitations period for X Strategies' claims for fraud, negligent misrepresentation, breach of fiduciary duty, conversion, unjust enrichment, and violation of the Florida Deceptive and Unfair Trade Practices Act, and a five-year limitations period for civil theft. X Strategies' federal civil RICO claim is likewise subject to a four-year limitations period. The Complaint, filed September 18, 2026, alleges conduct dating to 2021. To the extent X Strategies' claims rest on conduct occurring outside the applicable limitations period, those claims are time-barred.

**EIGHTH DEFENSE**

**(Failure to Satisfy Condition Precedent — Civil Theft)**

Count II (Civil Theft) is barred because X Strategies failed to satisfy a statutory condition precedent. Fla. Stat. § 772.11(1) requires that, before filing an action for civil theft, "the person claiming injury must make a written demand" on the person liable. The Complaint alleges only that X Strategies "has provided, or will provide prior to trial," the required demand, confirming

that no pre-suit written demand was made before this action was filed. X Strategies' failure to make the required pre-suit demand bars Count II.

**NINTH DEFENSE**

**(Failure to Plead Fraud with Particularity)**

Counts III (Fraudulent Misrepresentation), IV (Negligent Misrepresentation), and V (RICO) are barred, in whole or in part, because they sound in fraud and fail to plead the circumstances constituting fraud with the particularity required by Federal Rule of Civil Procedure 9(b). The Complaint does not identify the specific misrepresentations, the time, place, and person responsible for each statement, the manner in which each statement misled X Strategies, or what Defendants gained thereby.

**TENTH DEFENSE**

**(Failure to State a Civil RICO Claim)**

Count V (RICO) fails to state a claim under 18 U.S.C. § 1962(c). The Complaint pleads its purported predicate acts of wire, bank, and mail fraud and money laundering only by category, without the particularity Rule 9(b) requires. At most it alleges a single scheme with a discrete goal and therefore no "pattern" of racketeering activity; it alleges operation-or-management conduct by no defendant other than Utley; and it fails to allege that any predicate act was the direct cause of injury to X Strategies' business or property.

**ELEVENTH DEFENSE**

**(FDUTPA Inapplicable — No Consumer Transaction)**

Count VII (FDUTPA) is barred because the Florida Deceptive and Unfair Trade Practices Act has no application to an employer's claims against a former officer, insider, or competitor arising from alleged internal misconduct and the diversion of business. X Strategies' claims do not

arise from a consumer transaction, and X Strategies did not act as a consumer or purchaser of goods or services in the dealings underlying this action.

**TWELFTH DEFENSE**

**(Constructive Trust Is a Remedy, Not a Cause of Action)**

Count XI (Imposition of Constructive Trust) fails to state a claim because, under Florida law, a constructive trust is not an independent cause of action but an equitable remedy that must rest on an established underlying cause of action. To the extent the underlying claims fail or are barred, X Strategies has no constructive-trust remedy.

**THIRTEENTH DEFENSE**

**(Express Contract Bars Quasi-Contract Claims)**

Count VI (Unjust Enrichment), and any claim for a constructive trust predicated upon it, are barred to the extent an express contract—including the Settlement Agreement, the Membership Interest Purchase Agreement, and the Employment Agreement—governs the same subject matter. A party may not pursue a quasi-contract claim for unjust enrichment where an express contract concerning the same subject matter exists.

**FOURTEENTH DEFENSE**

**(Independent Tort Doctrine)**

X Strategies' tort claims, including Counts I, III, and IV, are barred to the extent they are not independent of, and merely duplicate, the obligations and alleged breaches of the parties' express agreements, including the Employment Agreement.

//

//

**FIFTEENTH DEFENSE**

**(Unclean Hands and In Pari Delicto)**

X Strategies' equitable claims, including Counts VI (Unjust Enrichment) and XI (Constructive Trust), are barred, in whole or in part, by the doctrines of unclean hands and in pari delicto. X Strategies and its principals, including Alexander Bruesewitz, engaged in conduct directly related to the matters in litigation, including their own knowledge of and participation in the distributions, transactions, and arrangements now challenged. As detailed in the Factual Background above, Bruesewitz and other Company principals also engaged in substantially similar conduct to that alleged against Utley, including the diversion of corporate opportunities, the receipt of substantial personal compensation and equity benefits arising from Company relationships, and the concealment of financial arrangements from Utley. Having participated in or benefited from such conduct, X Strategies cannot obtain equitable relief based on a selective accounting of the parties' financial dealings while disregarding its own conduct and responsibility.

**SIXTEENTH DEFENSE**

**(Setoff and Recoupment)**

Any recovery by X Strategies must be reduced or extinguished by setoff and recoupment, including for the value of the 50% membership interest in X Strategies that Stark Industries transferred to Bruz in settlement, for distributions made to Bruesewitz and Bruz, and for amounts owed to Defendants. Defendants further assert that any accounting of the parties' financial dealings must include consideration of the substantial equity interests, compensation, revenues, and corporate opportunities obtained or diverted by Bruesewitz through X Strategies' business relationships, including the PublicSquare transactions and other arrangements described above.

//

**SEVENTEENTH DEFENSE**

**(Failure of Consideration / Prior Breach)**

Count IX (Breach of Employment Agreement) is barred, in whole or in part, by failure of consideration and X Strategies' own prior material breach of the Employment Agreement, including its termination of Utley's employment without cause, which excused Utley's further performance.

**EIGHTEENTH DEFENSE**

**(Arbitration and Jury-Trial Waiver)**

Count IX (Breach of Employment Agreement) and all disputes relating to the Employment Agreement are subject to the Agreement's binding arbitration provision (Section 15), which requires that disputes concerning the Agreement be submitted to binding arbitration before the American Arbitration Association in West Palm Beach, Florida, and Defendants reserve the right to move to compel arbitration and to stay these proceedings. In all events, X Strategies and Utley knowingly and voluntarily waived any right to trial by jury in any action arising under, based upon, or related to the Employment Agreement (Section 16).

**NINETEENTH DEFENSE**

**(Failure to Mitigate Damages)**

X Strategies' claims for damages are barred or reduced to the extent X Strategies failed to take reasonable steps to mitigate its alleged damages.

**TWENTIETH DEFENSE**

**(Unenforceable and Overbroad Restrictive Covenants)**

To the extent Count IX and X Strategies' request for injunctive relief seek to enforce restrictive covenants in the Employment Agreement, such enforcement is barred to the extent the

covenants are not supported by a legitimate business interest or are overbroad in time, scope, or activity under Fla. Stat. § 542.335. Further, the Employment Agreement's non-competition covenant (Section 8(d)) applies only "during Employee's employment with the Company" and imposes no post-termination non-compete obligation.

**TWENTY-FIRST DEFENSE**

**(No Entitlement to Punitive Damages)**

X Strategies is not entitled to punitive damages. X Strategies has made no reasonable evidentiary showing that would provide a reasonable basis for the recovery of punitive damages as required by Fla. Stat. § 768.72, and no punitive damages are recoverable on Count II (Civil Theft) under Fla. Stat. § 772.11.

**TWENTY-SECOND DEFENSE**

**(Reservation of Rights)**

Defendants have not knowingly or intentionally waived any applicable defense, and they reserve the right to assert, and to rely upon, such other and further defenses as may become available or apparent during discovery and the further proceedings in this action, and to amend their answer and defenses accordingly. Defendants also reserve their rights to file a separate action against Bruesewitz and Bruz for breach of the Confidential Settlement Agreement.

WHEREFORE, Defendants Derek Utley and Stark Defense Industries, Inc. respectfully request that the Court dismiss the Complaint with prejudice, enter judgment in Defendants' favor and against X Strategies on all Counts, award Defendants their costs and reasonable attorneys' fees as permitted by contract and law, and grant such other and further relief as the Court deems just and proper.

//

## COUNTERCLAIM

Counter-Plaintiff Derek Utley ("Utley") sues Counter-Defendant X Strategies, LLC ("X Strategies" or the "Company") for breach of the Employment Agreement and alleges:

**Parties**

1. Counter-Plaintiff Derek Utley is an individual who resides in Palm Beach County, Florida.

2. Counter-Defendant X Strategies, LLC is a limited liability company with its principal place of business in Palm Beach County, Florida.

**Jurisdiction and Venue**

3. This Court has supplemental jurisdiction over this Counterclaim under 28 U.S.C. § 1367(a) because it arises from the same Employment Agreement and employment relationship at issue in the Complaint and forms part of the same case or controversy. This Counterclaim against X Strategies is compulsory under Federal Rule of Civil Procedure 13(a).

4. Venue is proper in this District under 28 U.S.C. § 1391(b) and the venue provisions of the Employment Agreement.

**Factual Allegations**

5. Utley and X Strategies entered into a written Employment Agreement effective April 3, 2026, under which X Strategies employed Utley as "Chairman Emeritus and Executive Advisor to the CEO" for a one-year Initial Term at an annual salary of $180,000, plus commissions on identified client accounts. A copy of the Employment Agreement is attached as Exhibit A.

6. On or about February 12, 2026, Utley was injured in a motor vehicle collision while riding as a passenger in an Uber.

7. As a result of his injuries, Utley had to attend medical appointments during normal business hours.

8. X Strategies accused Utley of submitting false medical records. Utley did not fabricate, alter, or forge the medical records he provided.

9. X Strategies terminated Utley's employment, alleging that he fabricated the accident and his injuries. Those allegations were false, and the termination was without cause.

10. All conditions precedent to this Counterclaim have occurred, have been performed, or have been waived or excused.

11. Utley has retained undersigned counsel and is obligated to pay a reasonable fee for their services.

**COUNT I**
**BREACH OF THE EMPLOYMENT AGREEMENT**
**(Utley against X Strategies)**

12. Utley realleges paragraphs 1 through 11.

13. The Employment Agreement is a valid and enforceable contract between Utley and X Strategies.

14. Utley performed his obligations under the Employment Agreement, except to the extent performance was excused or prevented by X Strategies' own material breach.

15. X Strategies materially breached the Employment Agreement by terminating Utley's employment without cause during the one-year Initial Term, based on false accusations that he fabricated the accident, his injuries, and his medical records.

16. As a direct and proximate result of X Strategies' breach, Utley suffered damages, including the loss of compensation and benefits to which he was entitled under the Employment Agreement, in an amount to be established at trial.

17. Utley demands a trial by jury on his Counterclaim.

WHEREFORE, Utley requests that the Court enter judgment against X Strategies for compensatory damages arising from its breach of the Employment Agreement; award prejudgment and postjudgment interest as permitted by law and taxable costs; and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**SARELSON & SAJDERA, PLLC**

Matthew Sarelson, Esq.
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
Telephone: (305) 773-1952
Matt.sarelson@ssxlaw.com

Counsel for Defendants and Counter-Plaintiff
Derek Utley and Stark Defense Industries, Inc.