**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

X STRATEGIES, LLC,

Plaintiff,

v. CASE NO. 9:26-cv-81194-EA

DEREK UTLEY,
STARK DEFENSE INDUSTRIES
INC., ANNA WEISHEIMER, and
ANNA DICENZO FITNESS, LLC,

Defendants.

______________________________/

# AMENDED COMPLAINT

Plaintiff, X Strategies, LLC ("X Strategies," "Plaintiff," or the "Company"), hereby files this Amended Complaint against Defendants, Derek Utley ("Utley"), Stark Defense Industries, Inc. ("Stark Industries"), Anna Weisheimer a/k/a Anna Dicenzo ("Weisheimer"), and Anna Dicenzo Fitness, LLC ("Dicenzo Fitness") (collectively, "Defendants"). In support thereof, X Strategies alleges as follows:

## INTRODUCTION

1. X Strategies is a prominent social media strategy and consulting firm headquartered in Palm Beach County, Florida.

2. X Strategies was founded in 2017 by Mr. Alexander Bruesewitz ("Bruesewitz"). Bruesewitz, working through his company, X Strategies, was one of the architects of the social media strategy of Donald J. Trump's historic

2024 presidential campaign. Bruesewitz currently serves as a trusted social media advisor to President Trump.

3. X Strategies provides strategic consulting services to companies, organizations, and prominent individuals designed to enhance their visibility, engagement, reach, and growth on social media. X Strategies helps its clients achieve their social media marketing goals and objectives.

4. Utley is the former Chairman and Chief Financial Officer ("CFO") of X Strategies. In that role, Utley was responsible for overseeing X Strategies' internal operations, management, accounting, and finances. Utley had unrestricted and exclusive access to X Strategies' systems, databases, and banking accounts.

5. Beginning in 2021, and continuing through 2026, Utley embezzled millions of dollars from X Strategies. Utley exploited his exclusive control over X Strategies' finances and the position of trust he held as a senior officer of X Strategies to siphon off funds for his own personal benefit. Utley disguised personal expenditures as business expenses, laundered and gambled stolen funds at casinos (keeping the winnings for himself, if he won, but causing X Strategies to absorb the losses – he lost far more than he won), diverted company funds to personal investments and to Stark Industries and Dicenzo Fitness (entities owned and controlled by Utley), and fabricated financial records to conceal his embezzlement.

6. As Utley embezzled more money from X Strategies year-over-year, his extravagant lifestyle grew and his gambling addiction accelerated. Using money stolen from X Strategies, Utley purchased luxury sports cars, designer

clothing, jewelry, traveled to exclusive locations first-class (with an entourage), and wagered higher amounts at casinos on a more regular basis. Using the Company's money, Utley won a total of $26,000,000 playing slots at a single casino in a single year (spending 200 days out of the year in that casino). Utley, however, also lost $29,000,000 at this casino during the same time period, ultimately leading to a net loss of $3,000,000.

7. After X Strategies discovered Utley's embezzlement, Utley engaged in a campaign of deceit and dishonesty, resulting in his departure. On his way out, Utley engaged in a calculated campaign to sabotage X Strategies' client relationships, steal customers, divert funds from X Strategies, and disparage X Strategies to current and prospective clients.

8. A forensic audit of X Strategies' finances, which remains ongoing, has revealed that Utley embezzled at least $5,000,000. This action seeks to recover those stolen funds, to hold Utley and his co-conspirators accountable, and to prevent him from causing further harm to X Strategies.

**THE PARTIES**

9. X Strategies is a limited liability company with its principal place of business in Palm Beach County, Florida. X Strategies is a social media consulting and strategic communications firm that provides consulting services to companies, organizations, and individuals seeking to enhance their visibility and engagement on social media. X Strategies is an industry leader with a proven track record of exceptional results.

10. Utley is an individual who resides in Palm Beach County, Florida. Utley is the former Chairman and CFO of X Strategies. Utley controlled the

Company's finances and oversaw its internal operations, management, and accounting until his removal from leadership and subsequent termination. Utley currently identifies himself as the President of Tower Strategy Communications, LLC a subsidiary of Tower Strategy, LLC, a former client and now competitor of X Strategies with offices in West Palm Beach, Florida.

11. Stark Industries is a Florida corporation with its principal place of business in Palm Beach County, Florida. Stark Industries is wholly owned and controlled by Utley. Stark Industries is a former owner of X Strategies.

12. Dicenzo Fitness is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Dicenzo Fitness owns and has investments in fitness studios located in Miami-Dade County, Florida. Dicenzo Fitness is owned and controlled by Stark Industries, Utley, and Weisheimer. Upon information and belief, Dicenzo Fitness is a front used by Utley and Weisheimer to launder funds embezzled from X Strategies.

13. Weisheimer is an individual who resides in Miami-Dade County, Florida. Weisheimer is a member and partial owner of Dicenzo Fitness.

## JURISDICTION AND VENUE

14. This is a civil action for, among other things, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, breach of fiduciary duty, civil theft, fraud, negligent misrepresentation, conversion, unjust enrichment, breach of contract, violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),

violations of the Florida Uniform Trade Secrets Act ("FUTSA"), unfair competition, and imposition of a constructive trust.

15. The amount in controversy exceeds the sum of $75,000, exclusive of interest, costs, and attorney fees.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the laws of the United States.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.

18. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district, X Strategies maintains its principal place of business in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**GENERAL ALLEGATIONS**

Founding and Management of X Strategies

19. X Strategies was founded in 2017 by Utley and Bruesewitz. At the time, Utley was thirty-two (32) years of age and Bruesewitz was nineteen (19) years of age. Utley owned 50% of X Strategies through his company, Stark Industries. Bruesewitz owned 50% of X Strategies through a limited liability company that he was the sole member of.

20. Between 2017 and early 2026, Utley acted as the Chairman and CFO of X Strategies. In that role, Utley was responsible for overseeing the

finances, management, accounting, and operations of X Strategies. Utley had exclusive access to X Strategies' bank accounts and financial records.

21. From 2017 through the present, Bruesewitz acted as the Chief Executive Officer of X Strategies and was responsible for overseeing sales, client services, and the management of the Company's employees and independent contractors.

22. X Strategies' revenues grew steadily over the years, as did X Strategies' prominence and reputation within its industry. X Strategies eventually became a nationally leading social media and consulting firm.

23. To better serve its current clients and attract new clients, X Strategies moved its corporate headquarters to West Palm Beach, Florida in 2019.

24. As a result of the excellent work done by Bruesewitz, his personal attributes, and his significant social media influence, Bruesewitz's prominence and reputation grew with the success of X Strategies and helped accelerate X Strategies' growth. Utley's social prominence and reputation, however, did not grow along with X Strategies' success and did not contribute to its growth.

<u>Utley's Embezzlement of Company Funds</u>[1]

25. Despite his growing prominence and influence, Bruesewitz remained true to his character and purpose. He was not driven by the pursuit of

[1] X Strategies' investigation into Utley's theft remains ongoing because (a) Utley intentionally kept terrible books and records, (b) Utley was hiding his theft through a complex scheme of structured transactions, (c) X Strategies does not have complete knowledge of all accounts Utley opened, and (d) and X Strategies has no access to the X Strategies' bank accounts that were closed due to Utley's actions.

wealth, but by a desire to make a positive impact in the industry and provide high-quality services to X Strategies' clients. He maintained strict sobriety, remained focused on his work, and resisted the temptation to significantly elevate his lifestyle. Over time, he became a trusted advisor to world leaders, fully embraced his faith through baptism, and married.

26. Utley, on the other hand, underwent a significant negative transformation as X Strategies grew. Financial gain and social influence became a driving force in his life. As X Strategies and Bruesewitz gained prominence, Utley developed a resentment for Bruesewitz and his success. Utley developed an alcohol dependency and a gambling addiction.

27. Utley's work for X Strategies slowly ceased to be his priority. Utley began showing up to work less often over time and performing less of his work duties. It was not apparent to Bruesewitz initially that Utley had developed alcohol and gambling addictions.

28. Bruesewitz trusted that, even though Utley was working less and offering less value to X Strategies, he was still diligently managing X Strategies' finances and accounting, internal operations, and internal management. Because X Strategies continued to grow in prominence, attracting high profile clients and turning a profit, Bruesewitz believed that Utley was doing his job. Bruesewitz trusted that Utley remained an honest and integrous person.

29. Unfortunately, Bruesewitz was wrong. Behind his back, Utley was concocting a scheme to embezzle money from X Strategies to fuel his increasingly extravagant lifestyle and addictions. Bruesewitz's historical trust of Utley caused him to permit Utley to maintain exclusive control over X

Strategies' bank accounts, bookkeeping, and financial reporting. This placed Utley in a unique position to hide his malfeasance and theft. Utley exploited this position of trust to perpetuate his scheme and conceal his wrongdoing from Bruesewitz.

30. Utley's embezzlement scheme was brazen, complex, and multifaceted. To start, Utley began disguising large personal withdrawals to Stark Industries as legitimate business expenses. To further launder the funds, Stark Industries would route them through a complex web of banking transactions that ultimately provided the funds to Utley, to other companies that he owned (like Dicenzo Fitness), or to entities and individuals that Utley owed money to.

31. Utley disguised his embezzlement by flooding X Strategies' bank statements with a high volume of financial transactions on a near-daily basis, moving funds among different company accounts and transferring money into and out of those accounts, in order to conceal the unauthorized withdrawals. This is a common tactic used by embezzlers and money launderers to conceal illegal activity.

32. Ultimately, Utley became more and more brazen over time. He began routing withdrawals straight to himself, began withdrawing company funds directly from ATMs at various casinos throughout the United States, and became less disciplined in his efforts to directly conceal the embezzlement on the Company's books.

33. When Utley's abnormally high volume of banking transfers drew scrutiny from X Strategies' banks, Utley would lie and make false

representations to the bank about the reasons for the unconventional activity. For example, Utley would falsely represent that the large withdrawals he made at various casinos were necessary expenses for entertaining clients and were otherwise authorized by X Strategies. He also falsely represented that the high volume of wire transfer activity was necessary for X Strategies' business operations.

34. To extract additional funds from X Strategies without drawing more scrutiny, Utley maintained a designation as a W-2 employee, taking a salary in addition to his company distributions. X Strategies did not authorize Utley to make this designation as both Utley and Bruesewitz had agreed to forego W2 status to ensure more resource availability for company growth.

35. Utley consistently lied to Bruesewitz about the Company's performance, revenues, and expenses, and lied about how much revenue X Strategies had re-invested in company growth. Utley also kept incomplete and confusing books and records to further hide his malfeasance, fabricating X Strategies' financial records to further hide his embezzlement from Bruesewitz and other company members. On a monthly basis, Utley would regularly report false financial statistics and would tell Bruesewitz that he would send the written financial reports at a later date to support his oral summary. These financial misrepresentations occurred in-person at X Strategies' headquarters. Bruesewitz believed at the time that X Strategies' financial records were being properly maintained, audited, and tracked by Utley and professional accounting firms. But, ultimately, they were not.

36. Utley's theft from X Strategies allowed him to fund an increasingly extravagant lifestyle. He began purchasing luxury sports cars, designer clothes, and renting opulent condominiums. He also began taking lavish vacations and attending high-profile events with an entourage, funded by money he embezzled from X Strategies.

37. Utley also began purchasing luxury items for his then girlfriend, Weisheimer. At all times, Weisheimer knew that Utley was embezzling funds from X Strategies and encouraged him to continue doing so. Weisheimer profited substantially from Utley's embezzlement, and she purchased (or had Utley purchase her) designer clothes, designer handbags, and designer jewelry with X Strategies' funds. She also had Utley wire her over one hundred thousand dollars in cash from X Strategies.

38. Utley portrayed his extravagant lifestyle as a product of his substantial gambling winnings, his standard paycheck from X Strategies, and alternate income streams. Bruesewitz believed this to be true at the time. Although Bruesewitz did not agree with Utley's undisciplined lifestyle, Bruesewitz believed Utley simply had different personal priorities and was not financially frugal with his earnings.

<u>Utley Gambled With Company Funds</u>

39. Utley used various casinos across the United States, including Las Vegas, Nevada and Coconut Creek, Florida, to further launder the funds he stole from X Strategies.

40. Utley opened up accounts at casinos where he would mix funds he stole from X Strategies with money from other sources. Utley would also

withdraw funds directly from X Strategies' bank account at the casino's ATM (under the guise of entertaining clients), then re-deposit the funds in his personal casino account after gambling. Utley then kept the stolen funds in these casino accounts to make them hard to trace and hard to access.

41. Eventually, Utley's gambling evolved from a method of laundering funds to an addiction. Utley began to spend days on end at casinos across the United States, gambling into the early hours of the morning and drinking heavily.

42. In 2025 alone, Utley spent two hundred (200) days gambling at the Hard Rock casino in South Florida, using the Company's money to win over $26,000,000 playing slots, but ultimately losing $29,000,000 for a total loss on the slot machines of $3,000,000 that year. It is unknown how much Utley won or lost gambling company money on other games of chance or table games at these casinos.

43. As Utley's addictions continued to grow, he began to steal money from X Strategies for the sole purpose of funding his gambling addiction. When he lost, the money was gone forever. But when he won, he kept the winnings for himself. X Strategies took all the risk—Utley got all the reward. Utley accrued an untold number of perks, benefits, credits, and other things of value for himself as a result of his gambling of X Strategies' money at these casinos.

<u>Utley's Personal Investments Using Company Funds</u>

44. In addition to embezzling Company money to fund his luxury lifestyle and gambling addiction, Utley used X Strategies' funds to make personal investments in other companies. Utley used X Strategies' funds to

purchase himself equity in various business interests. Any return on the investments was kept by Utley. Any loss was borne by X Strategies. Once again, X Strategies took all of the risk—Utley got all of the reward.

45. On or about October 30, 2025, Utley wired $65,000 from X Strategies to Stark Industries, directly followed by a wire transfer to Tabby, a payment technology company that Stark Industries and Utley purchased a stake in. Utley and Stark Industries have substantially profited from this investment they made with funds stolen from X Strategies.

46. On or about February 2026, Utley and his then-girlfriend Weisheimer, embezzled a significant amount of X Strategies' funds to purchase a fitness studio together.

47. Utley and Weisheimer formed a separate LLC called Dicenzo Fitness (named after Weisheimer's alias). Utley made Stark Industries and Weisheimer members of Dicenzo Fitness. Utley then transferred X Strategies' funds to himself, to Stark Industries, or to Weisheimer, who then routed funds to Dicenzo Fitness to purchase and take ownership of a fitness studio in Miami, Florida.

48. Utley, Stark Industries, Weisheimer, and Dicenzo Fitness have profited substantially from the purchase of the fitness studio using X Strategies' funds.

49. Upon information and belief, Utley and Stark Industries used Dicenzo Fitness as an additional method of laundering the funds Utley stole from X Strategies, injecting stolen funds onto the balance sheets of Dicenzo Fitness and disguising them as legitimate income in order to hide their origins.

50. Utley made many other investments with X Strategies' funds, purchasing personal stakes in a variety of other business interests.

Utley Diverted Company Opportunities

51. Utley also stole company opportunities and customers while serving as the Chairman and CFO of X Strategies.

52. Instead of presenting opportunities to X Strategies, Utley stole the opportunities for himself or diverted them to his other companies, including Stark Industries.

Utley Took Out Unnecessary High-Interest Rate Loans

53. Eventually, Utley's embezzlement of Company funds outpaced X Strategies' revenues and Utley forced X Strategies to take out high-interest rate loans so Utley could continue stealing at the same pace without getting caught. Utley never notified Bruesewitz that he caused X Strategies to take out high-interest rate loans.

X Strategies Catches Utley

54. In 2026, X Strategies hired prominent South Florida businessman, Michael Seifert ("Seifert"), to be its President. Prior to joining X Strategies, Seifert was the CEO of a publicly traded company. In addition, Seifert was a longtime friend of both Utley and Bruesewitz. Seifert was brought in to professionalize X Strategies, increase sales, and diversify X Strategies.

55. Immediately upon joining X Strategies, Seifert noticed that something was not right with X Strategies' accounting and finances. X Strategies' cash on hand was mathematically inconsistent with its reported revenues. After accounting for distributions paid to Stark Industries and

Bruesewitz's company, as well as operating expenses, X Strategies should have had millions of dollars more in cash than it actually did.

56. Unexpectedly, X Strategies had received a late-night message from a third-party who stated that Utley had just requested an urgent large cash wire transfer so X Strategies could make payroll the following day. Utley had called the third-party late at night from a casino in Las Vegas, highly intoxicated, and pleaded with the third-party to wire transfer a substantial sum of cash to Utley, allegedly so he could ensure X Strategies made payroll.

57. In reality, Utley had just lost a substantial amount of money at the casino and needed additional gambling money to get out of the hole he dug himself that night. X Strategies told the third-party not to transfer the money to Utley because the situation sounded like a scam.

58. The situation was highly concerning to X Strategies and Seifert investigated it. He discovered that Utley had in fact tried to scam this third-party into sending him a large amount of money by falsely claiming he needed it for X Strategies' payroll.

59. Seifert suggested that X Strategies audit its books and records and Bruesewitz agreed.

60. To start the audit, Seifert requested access to X Strategies' bank accounts from Utley. Initially, Utley refused to give Seifert access. This, of course, was unacceptable and untenable. Eventually, Utley relented and gave Seifert access to X Strategies' bank accounts.

61. What Seifert discovered was shocking. After sifting through the voluminous daily transactions that Utley used to disguise his embezzlement,

Seifert learned that Utley was regularly withdrawing large sums of money from X Strategies' bank accounts at casinos, X Strategies was regularly sending Utley and Stark Industries large sums of money for no apparent reason, and Utley was reimbursing himself for significant expenditures that had nothing to do with the business of X Strategies.

62. Seifert learned that multiple banks had shut down X Strategies' bank accounts due to suspicious transactions and he discovered the high-interest rate loans Utley took out on behalf of the Company.

63. Seifert determined that Utley's numerous payments to himself, and Stark Industries, were not distributions because almost none of the transfers had an equivalent payment to Bruesewitz.

64. After discovering that Utley had been looting X Strategies, Seifert confronted Utley. Utley initially denied what he had done.

65. Utley then ultimately admitted to Seifert that he stole millions of dollars from X Strategies. Utley blamed the theft on his low self-esteem, his desire to have more influence and impress others, and his gambling and alcohol addictions.

Utley's Removal from X Strategies

66. Seifert presented Bruesewitz with the information he discovered during his investigation of Utley and recommended that Utley be removed from X Strategies' leadership immediately. Bruesewitz reviewed Seifert's findings and agreed that Utley could no longer continue in his current role.

67. On April 3, 2026, Stark Industries voluntarily relinquished its ownership interest in X Strategies and Utley voluntarily resigned as the Chairman and CFO of X Strategies.

68. X Strategies was hopeful that Utley could receive help for his problems and help contribute to X Strategies' success again. X Strategies permitted Utley to become a normal W-2 employee on a temporary basis, with tight restrictions and expectations, if he committed to honesty, integrity, and seeking treatment for his gambling and alcohol addictions. Utley agreed to all these conditions.

69. Utley's new job duties included, but were not limited to:

a. sales;

b. client relations;

c. promoting a positive work environment;

d. complying with the Company's policies and procedures;

e. complying with the highest ethical standards; and

f. performing any other tasks as directed by the Company's Chief Executive Officer.

70. Utley was expected to physically work in X Strategies' office and to be in the office most working days.

<u>Utley's Actions as an Employee of X Strategies and Termination</u>

71. Utley's employment with X Strategies was unsuccessful from the outset. He refused to work in the office on a regular basis and was frequently unavailable during normal business hours, especially in the mornings. He had no new sales. He did not improve or even maintain X Strategies' relationship

with any of its clients. X Strategies' other employees did not want to work with Utley due to his poor attitude and unprofessional behavior.

72. It is unknown whether Utley ultimately sought treatment for his gambling and alcohol addictions, but his behavior during this time period provided every indication that he did not.

73. It quickly became apparent that Utley had no intention of performing any of his job duties for X Strategies.

74. Seifert confronted Utley about his abysmal performance and lack of attendance and availability.

75. Utley told Seifert that his poor performance was the result of an injury he suffered six (6) months earlier while riding in an Uber. Utley claimed that he was traveling as a passenger in an Uber that was hit by another vehicle traveling at over sixty (60) MPH. Utley claimed the vehicles involved were totaled and that he was significantly injured in the crash.

76. Utley demanded six (6) months' paid leave to recover from the alleged auto accident.

77. Of course, Utley had never informed anyone at X Strategies that this alleged auto accident occurred before.

78. Seifert asked Utley to provide X Strategies with whatever records Utley had to substantiate that the auto accident occurred and that he had suffered a serious injury.

79. In response, Utley stated that he had no records that the accident occurred and said there was no police report from the accident. Utley claimed,

incredulously, that he called another Uber and left the scene of the accident before any police officers arrived on the scene.

80. Utley did, however, submit what he purported to be corroborating medical records to X Strategies. The medical records, allegedly from Radius TBI of South Florida, provided a diagnosis for Utley and stated that he required six (6) months off work.

81. Seifert called Radius TBI of South Florida to confirm the legitimacy of the medical record. Radius TBI of South Florida stated that the medical records provided to X Strategies by Utley were fake. Radius TBI of South Florida's medical professionals never created or signed these medical records.

82. In reality, Utley had created fake medical records, forged the signature of a practicing medical doctor, and submitted them to X Strategies in an attempt to fraudulently get six (6) months' paid medical leave.

83. X Strategies terminated Utley for submitting fake medical records.

84. X Strategies and Utley had entered into an Employment Agreement that governed Utley's termination. A copy of the Employment Agreement is attached as **Exhibit A.**

85. The Employment Agreement contained, among other provisions, a non-solicitation clause restricting Utley from competing with X Strategies by soliciting customers for one year following the termination of his employment, a non-disclosure clause requiring Utley to return all X Strategies property following his termination, and a non-disparagement clause:

> Non-Solicitation. During Employee's employment with the Company and for a one (1) year period of time thereafter, Employee shall not directly (whether as a partner, shareholder, agent,

independent contractor, employee, or otherwise), or indirectly (whether through a Company, partnership, affiliate, subsidiary or otherwise): (i) solicit clients of the Company in existence on the date Employee last works for the Company; nor (ii) communicate with any persons or other business-related entities in order to induce, facilitate, or encourage the assignment of business opportunities away from Company.

Confidential Information and Non-Disclosure of Confidential Information. During the term of this Agreement and forever thereafter, Employee will not disclose or cause to be disclosed in any manner (except as may be required by law or pursuant to court order), any such trade secrets or other confidential and proprietary information, directly or indirectly, to any third person or entity, including but not limited to, any direct or indirect competitor of the Company, or otherwise utilize any of this information in any way except as may be required during the course of, and pursuant to, Employee's duties with the Company or with Company's prior written consent. Employee agrees that Employee will hold all of the Company's confidential information in the strictest of confidences. Upon the termination of Employee's employment with the Company, or upon the request of the Company, at any time, Employee shall promptly deliver to the Company all documents, tapes, disks, or other storage media and any other materials, and all copies thereof in whatever form, in the possession of Employee pertaining to the business of the Company, including, but not limited to, any such media and materials containing the Company's confidential and/or proprietary information.

Non-Disparagement. During the Initial Term, any Extension Term, and for a period ending three (3) years after the date Employee's employment with the Company terminates, Employee shall not disparage or otherwise make derogatory or negative remarks or statements about the Company, its respective businesses, officers, employees, shareholders, members, managers, agents, or representatives, and neither shall take any action, encourage others, acquiesce, or assist in taking action to disparage, injure, discredit, or otherwise negatively portray the Company.

Utley's Misconduct Leading Up to and Following His Termination

86. Once Utley sensed that he would be terminated from X Strategies, he covertly stole virtually all of X Strategies' trade secret information and

confidential business information, which he is currently using to compete against X Strategies.

87. On or about May 15, 2026 through May 16, 2026, Utley logged on to X Strategies' servers. He then copied almost every file from his X Strategies' email mailbox and countless files from X Strategies' server to his personal device.

88. The files Utley stole appear to date all the way back to the Company's inception in 2017 and include virtually all of the files and documents on X Strategies' email mailboxes and cloud drive. The files Utley stole consist of X Strategies' customer lists, pricing models, business plans, communications with prospective, current, and former customers, completed and pending work product, its financial information, and all of its privileged correspondence with X Strategies' legal team, among other confidential information.

89. Through May 27, 2026, Utley regularly logged on to X Strategies' email server and spied on his superiors, reviewing and saving copies of emails sent to and sent by X Strategies' officers, including privileged and confidential emails.

90. After stealing confidential business information from X Strategies and spying on its officers, Utley then attempted to further sabotage X Strategies. On or about June 3, 2026, almost immediately after X Strategies sent Utley a letter terminating his employment, Utley logged on to X Strategies' server and permanently deleted hundreds of emails. The majority of the emails cannot be recovered, although the emails are believed to still be in Utley's possession since

the deletions on X Strategies' server occurred after he copied all of the emails to his personal device.

91. Even more egregiously, Utley then logged on to X Strategies' server and attempted to institute a protocol to block emails from domains associated with certain X Strategies' clients, including some of X Strategies' largest clients. Utley did this so X Strategies would not receive emails from clients that Utley planned to later solicit, and in a deliberate attempt to harm X Strategies' relationships with its clients. Utley hid all of this conduct from X Strategies. X Strategies only recently became aware of Utley's theft of trade secrets and attempt to sabotage X Strategies following a forensic audit of X Strategies' systems.

92. Utley also refused to turn over the credentials to X Strategies' website. To this day, Utley still maintains the website credentials in his name and is preventing X Strategies from maintaining and accessing its website domain.

93. Armed with nearly a decade of X Strategies' trade secrets, Utley then set out to compete with X Strategies.

94. Shortly after his termination, Utley started working for a long-time client of X Strategies, Tower Strategy, LLC ("Tower Strategy") in its West Palm Beach office.

95. Utley convinced Tower Strategy to cease being an X Strategies client by promising to provide them with the same services that X Strategies had been providing.

96. Utley then worked with Tower Strategy to form a new subsidiary, Tower Strategy Communications, LLC ("Tower Strategy Communications"). Tower Strategy Communications was formed to be a competitor of X Strategies. It provides the same services (although, not the same quality) as X Strategies to the same pool of customers, including Tower Strategy. Tower Strategy Communications appointed Utley as its President.

97. Upon information and belief, Utley provided Tower Strategy and Tower Strategy Communications with all of the trade secrets, customer lists, and confidential information he stole from X Strategies in order to help Tower Strategy and Tower Strategy Communications directly compete against X Strategies.

98. Using his stolen knowledge of X Strategies' customer list, pricing structure, and other trade secret information, Utley began soliciting X Strategies' current and prospective clients, attempting to undercut X Strategies in the marketplace. Utley called multiple X Strategies' clients and attempted to solicit them to terminate their advantageous business relationship with X Strategies and hire him instead. Utley also disparaged X Strategies and its officers to these current and potential clients.

99. Utley has since provided, or attempted to provide, services that compete directly with X Strategies to current or prospective clients of X Strategies using X Strategies' confidential information and trade secrets. Anyone with access to the type of information Utley has stolen has the ability to cause substantial and irreparable harm to X Strategies. Its "know-how" that has made it an industry leader can be copied or implemented by competitors

seeking to provide similar services; its business model and pricing strategy can be used by competitors to undercut X Strategies; and competitors will have access to carefully curated information about X Strategies' customer and prospective customer needs and preferences, which has been compiled through years of X Strategies' efforts.

100. Additionally, Utley continued attempts to embezzle funds from X Strategies after his termination. Utley contacted X Strategies' clients and represented that X Strategies was experiencing issues with its bank accounts. He instructed those clients to remit payment on outstanding invoices directly to him, claiming that he would then forward the funds to X Strategies. Those representations were false. At the time he made them, Utley was no longer authorized to receive payments on behalf of X Strategies, and his actions were an apparent attempt to divert company funds for his own benefit following his departure from the company.

101. After his termination, Utley also stole X Strategies' mail out of its UPS store mailbox on multiple occasions. Utley still possesses this mail.

102. Additionally, Utley had opened numerous credit cards, lines of credit, and accounts in X Strategies' name which he continued to use to pay for his personal expenses.

<u>X Strategies' Forensic Audit and Damages</u>

103. Seifert realized that the scope and complexity of Utley's scheme warranted the use of a professional accounting firm to perform a forensic audit. X Strategies engaged Vessel Advisors, a professional accounting firm, to conduct an audit of X Strategies' books and records to determine how much

money Utley stole from X Strategies. Vessel Advisors' audit remains ongoing but has already revealed that Utley embezzled at least $5,000,000 from X Strategies, far beyond what X Strategies expected.

104. Vessel Advisors also discovered a second high-interest rate loan that Utley had bound X Strategies to with no legitimate business reason. Utley had never notified Seifert about this loan, and it was not properly reflected in the Company's books and records. The loan was already in default and had to be paid off immediately with penalties.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST DEFENDANT UTLEY)**

105. Plaintiff realleges and incorporates paragraphs 1-70, and 103-104 as if fully set forth herein.

106. Utley, as Chairman and CFO of X Strategies and an owner of the Company, owed fiduciary duties of loyalty, care, and good faith to X Strategies. Utley's fiduciary duties required him to act in the best interests of X Strategies, to refrain from self-dealing, to disclose material information honestly and completely, to avoid conflicts of interest, and to not use his position for personal gain at the Company's expense.

107. Utley breached his fiduciary duties to X Strategies by, among other things: (a) embezzling at least $5,000,000 from X Strategies; (b) disguising personal withdrawals as legitimate business expenses; (c) diverting X Strategies' funds to Stark Industries and other entities for his personal use; (d) unilaterally designating himself as a W-2 employee and taking unauthorized salary payments; (e) gambling with Company funds and keeping any winnings

for himself while causing the Company to absorb losses; (f) using Company funds to make personal investments; (g) diverting corporate opportunities for his personal benefit; (h) causing the Company to take out high-interest rate loans without authorization; (i) fabricating financial records and lying about the Company's performance; (j) taking Tower Strategy away from X Strategies as a client and using it to compete against X Strategies; and (k) engaging in a complex scheme of structured transactions to conceal his theft.

108. Utley's breaches of fiduciary duty were intentional, willful, calculated to benefit himself at the expense of X Strategies, and the underlying acts were not performed for or on behalf of the Company. Utley exploited the position of trust he held as Chairman, CFO, and an owner to perpetuate his scheme and conceal his wrongdoing.

109. As a direct and proximate result of Utley's breach of the fiduciary duties he owed to X Strategies, X Strategies has suffered damages.

**COUNT II**
**CIVIL THEFT (Fla. Stat. § 772.11)**
**(AGAINST UTLEY AND STARK INDUSTRIES)**

110. Plaintiff realleges and incorporates paragraphs 1-70 and 86-104 as if fully set forth herein.

111. In violation of Florida Statutes Sections 812.012-812.037, Utley and Stark Industries knowingly obtained, and conspired with each other to obtain, funds that belonged to X Strategies.

112. Utley and Stark Industries knowingly and intentionally obtained or used, or endeavored to obtain or use, funds and property belonging to X

Strategies with the felonious intent to temporarily or permanently deprive X Strategies of the right to the property or a benefit from the property.

113. Specifically, Utley and Stark Industries stole from X Strategies by, among other things: (a) embezzling at least $5,000,000 from X Strategies' bank accounts; (b) withdrawing large sums of money from X Strategies' bank accounts at casinos to fund his gambling addiction; (c) diverting X Strategies' funds to Stark Industries and other entities for personal use; (d) unilaterally designating himself as a W-2 employee and taking unauthorized salary payments; (e) using Company funds to make personal investments while keeping the equity for himself; (f) gambling with Company funds, keeping winnings for himself while causing the Company to absorb the losses; (g) diverting corporate opportunities belonging to X Strategies for their personal benefit; and (h) stealing Company trade secrets and other information.

114. X Strategies has provided, or will provide prior to trial, the written demand required by Florida Statute § 772.11.

115. As a direct and proximate result of Utley and Stark Industries' theft, X Strategies has suffered damages in excess of $5,000,000. Pursuant to Florida Statute § 772.11, X Strategies is entitled to recover threefold the actual damages sustained, reasonable attorney's fees, and court costs.

## COUNT III
## FRAUDULENT MISREPRESENTATION
## (AGAINST DEFENDANT UTLEY)

116. Plaintiff realleges and incorporates paragraphs 1-44, 54-65, and 103-104 as if fully set forth herein.

117. Utley made false statements of material fact to X Strategies and its representatives, including statements regarding the Company's financial condition, revenues, expenses, bank accounts, and transactions. Utley's false statements included, but were not limited to: (a) false representations regarding the nature and purpose of wire transfers and payments from X Strategies to Stark Industries and other entities; (b) false representations that expenditures were legitimate business expenses when they were in fact personal expenses; (c) fabricated financial records designed to conceal his embezzlement; and (d) lies about the Company's performance, revenues, and expenses.

118. Instead of being a good steward of the Company's finances, like he purported to be doing, he gambled with tens of millions of dollars of the Company's money. In just 2025 alone, Utley gambled $29,000,000 of the Company's money at slots at a single casino, ultimately losing $3,000,000.

119. At the time Utley made these false statements, Utley knew that the statements were false.

120. Utley made these false statements with the intent to induce X Strategies to act in reliance upon them, specifically to allow him to continue his scheme to embezzle Company funds without detection.

121. X Strategies justifiably relied upon Utley's false statements because Utley was the Chairman and CFO of the Company, had exclusive access to the Company's bank accounts and financial records, and held a position of trust within the organization.

122. As a direct and proximate result of Utley's fraud, X Strategies has suffered damages in an amount to be determined at trial.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**(AGAINST DEFENDANT UTLEY)**

123. Plaintiff realleges and incorporates paragraphs 1-44, 54-65, and 103-104 as if fully set forth herein.

124. Utley made false statements of material fact to X Strategies as noted above.

125. Utley knew these representations were false. Alternatively, Utley should have known these representations were false because Utley failed to exercise reasonable care or competence in obtaining or communicating the information he provided to X Strategies.

126. The false information supplied by Utley included, but was not limited to: (a) false representations regarding the nature and purpose of Company expenditures and transactions; (b) fabricated or manipulated financial records; (c) misrepresentations regarding the Company's cash position, revenues, and expenses; and (d) concealment of the high-interest rate loans he caused the Company to take out. He never disclosed that he was spending all day every day at casinos gambling at slot machines with the Company's money.

127. Utley, as Chairman and CFO of X Strategies with exclusive control over the Company's finances, accounting, and financial reporting, supplied false information to X Strategies and its representatives in the course of his business or profession, or in a transaction in which he had a pecuniary interest.

128. Utley intended for X Strategies to rely on his false representations.

129. X Strategies justifiably relied on the false information supplied by Utley because Utley was the Chairman and CFO of the Company with exclusive access to and control over the Company's bank accounts, financial records, and accounting.

130. As a direct and proximate result of Utley's negligent misrepresentations, X Strategies has suffered damages.

## COUNT V
## RICO (18 U.S.C. §§ 1961-1968)
## (AGAINST ALL DEFENDANTS)

131. Plaintiff realleges and incorporates paragraphs 1-104 as if fully set forth herein.

132. At all times relevant hereto, Utley, Weisheimer, Stark Industries, Dicenzo Fitness, and other entities controlled by Utley, constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

133. Utley and the other defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

134. The pattern of racketeering activity consisted of multiple predicate acts of: (a) wire fraud, in violation of 18 U.S.C. § 1343, including the use of electronic communications, wire transfers, and electronic banking systems to effectuate his scheme to defraud X Strategies; (b) bank fraud, in violation of 18 U.S.C. § 1344; (c) money laundering, in violation of 18 U.S.C. §§ 1956–1957; and (d) mail fraud, in violation of 18 U.S.C. § 1341, including the use of the United States mails to further his scheme to defraud.

135. The predicate acts of racketeering activity constituted a "pattern" within the meaning of 18 U.S.C. § 1961(5) because they were related to each other and spanned a period of years (from at least 2021 through the present).

136. Utley's racketeering activity was the proximate cause of injury to X Strategies. X Strategies was injured by, among other things, the embezzlement of its funds, the diversion of its business opportunities, the destruction of its banking relationships, and the impairment of its client relationships.

137. Pursuant to 18 U.S.C. § 1964(c), X Strategies is entitled to recover threefold the damages it sustained, together with the cost of this suit, including reasonable attorney’s fees.

**COUNT VI**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

138. Plaintiff realleges and incorporates paragraphs 1-70 and 86-104 as if fully set forth herein.

139. Defendants were unjustly enriched by receiving and retaining embezzled funds, personal investments purchased with company money, unauthorized salary payments, and the proceeds of diverted business opportunities.

140. Stark Industries specifically received substantial wire transfers of embezzled funds from X Strategies, which it then forwarded to Utley or used as directed by Utley for his personal benefit.

141. Dicenzo Fitness received substantial wire transfers of embezzled funds from X Strategies which it used to purchase assets that would ultimately benefit Utley.

142. Weisheimer either directly received substantial wire transfers of embezzled funds from X Strategies, or otherwise received embezzled funds indirectly through Dicenzo Fitness, and enjoyed the substantial profits generated by those funds.

143. Utley received substantial wire transfers of embezzled funds from X Strategies and enjoyed the substantial profits generated by those funds.

144. X Strategies conferred a benefit upon Defendants by, among other things, entrusting Utley with control over its finances, providing him with access to its bank accounts and business resources, and paying distributions to Stark Industries as a member of the Company. In addition, X Strategies conferred a benefit on Defendants by providing them with its substantial industry connections, customer list, trade secrets, and ultimately the funds that Utley, Stark Industries, Weisheimer, and Dicenzo Fitness took from the company.

145. Defendants knew and appreciated the benefit conferred upon them by X Strategies.

146. Under the circumstances, it would be inequitable for Defendants to retain the benefit without paying the value thereof to X Strategies.

147. Specifically, Defendants were unjustly enriched by: (a) at least $5,000,000 in funds embezzled from X Strategies; (b) personal investments made with Company funds, including investments in Tabby and other companies; (c) 500,000 shares of Renovaro stock obtained through the diversion of a corporate opportunity belonging to X Strategies; (d) unauthorized W-2 salary payments taken by Utley; (e) luxury vehicles, designer clothing,

jewelry, and other personal property purchased with embezzled funds; (f) gambling winnings obtained using company funds while losses were absorbed by the Company; (g) a fitness studio and the subsequent revenue generated by its operation; and (h) other assets and benefits traceable to X Strategies' funds.

148. As a result of Defendants' unjust enrichment, X Strategies has been damaged in an amount to be determined at trial.

## COUNT VII
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. § 501.201 et seq.)
## (AGAINST DEFENDANT UTLEY)

149. Plaintiff realleges and incorporates paragraphs 1-104 as if fully set forth herein.

150. Utley engaged in unfair competition against X Strategies through the misappropriation of the Company's business opportunities, customer relationships, money, mail, confidential information, and company resources.

151. Specifically, Utley: (a) diverted corporate opportunities belonging to X Strategies for his own personal benefit while serving as an officer of the Company; (b) used Company funds and resources to establish competing business ventures; (c) contacted X Strategies' customers post-termination and attempted to divert their business to a competing enterprise; (d) solicited Tower Strategy to cease being a Company client and formed Tower Strategy Communications to compete against X Strategies; (e) stole X Strategies' confidential business information and trade secrets; (f) engaged in acts of sabotage such as deleting Company emails and blocking client email domains;

and (g) used X Strategies' confidential business information, trade secrets, and customer relationships to gain an unfair competitive advantage.

152. Utley also used the Company's money to gamble at casinos. He gambled with the Company's money and if he won, he kept the money, but if he lost the Company took the loss. Just in 2025 alone, Utley gambled $29,000,000 of the Company's money at slot machines at a single casino, ultimately losing $3,000,000.

153. The aforementioned conduct constitutes an unconscionable deceptive act or practice in violation of Fla. Stat. § 501.201 *et seq*.

154. Utley's unfair and deceptive acts and practices were likely to, and did in fact, mislead the Company's other owners, employees, and customers.

155. As a direct and proximate result of Utley's violations of FDUTPA, X Strategies has suffered actual damages in an amount to be determined at trial. X Strategies is entitled to recover its actual damages, declaratory and injunctive relief, and reasonable attorney's fees and costs pursuant to Florida Statute § 501.211.

**COUNT VIII**
**UNFAIR COMPETITION**
**(AGAINST DEFENDANT UTLEY)**

156. Plaintiff realleges and incorporates paragraphs 1-104 as if fully set forth herein.

157. Utley engaged in unfair competition against X Strategies through the misappropriation of the Company's business opportunities, customer relationships, confidential information, and company resources.

158. Specifically, Utley: (a) diverted corporate opportunities belonging to X Strategies for his own personal benefit while serving as an officer of the Company; (b) used Company funds and resources to establish competing business ventures; (c) contacted X Strategies' customers post-termination and attempted to divert their business to a competing enterprise; (d) solicited Tower Strategy to cease being a Company client and formed Tower Strategy Communications to compete against X Strategies; (e) stole X Strategies' confidential business information and trade secrets; (f) engaged in acts of sabotage such as deleting Company emails and blocking client email domains; and (g) used X Strategies' confidential business information, trade secrets, and customer relationships to gain an unfair competitive advantage.

159. Utley's conduct was willful, intentional, and calculated to injure X Strategies and benefit himself at the Company's expense.

160. Utley solicited Tower Strategy to stop being a client of the Company and formed Tower Strategy Communications, a subsidiary of Tower Strategy, in order to compete against the Company.

161. As a direct and proximate result of Utley's unfair competition, X Strategies has suffered damages in an amount to be determined at trial.

## COUNT IX
## BREACH OF EMPLOYMENT AGREEMENT
## (AGAINST DEFENDANT UTLEY)

162. Plaintiff realleges and incorporates paragraphs 1-24 and 66-104 as if fully set forth herein.

163. X Strategies and Utley entered into a valid and enforceable Employment Agreement. The Employment Agreement contained, among other

provisions, A) a non-solicitation clause restricting Utley from soliciting X Strategies' customers for one year following his employment; B) a non-disclosure clause prohibiting Utley from disclosing X Strategies trade secrets and confidential business information to any third-party and requiring Utley to return any Company information in his possession upon termination; and C) a non-disparagement clause preventing Utley from disparaging the Company and its representatives for three years following his employment.

164. Utley materially breached the Employment Agreement by, among other things, stealing virtually all of X Strategies' confidential information and trade secrets, contacting X Strategies' customers and soliciting their business for a competing enterprise, disparaging X Strategies and its officers, and actually competing directly with X Strategies using X Strategies' confidential business information.

165. As a direct and proximate result of Utley's breach of the Employment Agreement, X Strategies has suffered damages in an amount to be determined at trial.

## COUNT X
## CONVERSION
## (AGAINST UTLEY AND STARK INDUSTRIES)

166. Plaintiff realleges and incorporates paragraphs 1-104 as if fully set forth herein.

167. X Strategies had an ownership interest in the funds, assets, and property that Utley and Stark Industries wrongfully took, including but not limited to the funds in X Strategies' bank accounts, business opportunities belonging to X Strategies, and other corporate property.

168. Utley and Stark Industries wrongfully exercised dominion and control over X Strategies' funds and property in a manner inconsistent with X Strategies' ownership rights. Utley and Stark Industries wrongfully withdrew funds from X Strategies' bank accounts, diverted corporate opportunities for his personal benefit, and transferred X Strategies' funds to Stark Industries without authorization. Utley and Stark Industries wrongfully received and retained X Strategies' funds, knowing that such funds were embezzled from X Strategies.

169. Utley and Stark Industries' exercise of dominion and control over X Strategies' property was unauthorized and was inconsistent with X Strategies' rights as owner of the property.

170. As a direct and proximate result of Utley and Stark Industries' conversion, X Strategies has suffered damages in an amount to be determined at trial, but believed to be in excess of $5,000,000.

## COUNT XI
## IMPOSITION OF CONSTRUCTIVE TRUST
## (AGAINST ALL DEFENDANTS)

171. Plaintiff realleges and incorporates paragraphs 1-104 as if fully set forth herein.

172. Defendants obtained funds, assets, investments, and property through their wrongful conduct as set forth herein, including through embezzlement, fraud, breach of fiduciary duty, and diversion of corporate opportunities.

173. Utley, Stark Industries, Weisheimer, and Dicenzo Fitness knowingly received and retained embezzled funds transferred from X Strategies by Utley.

174. Defendants would be unjustly enriched if permitted to retain the funds, assets, investments, and property they acquired through their wrongful conduct.

175. X Strategies requests that this Court impose a constructive trust on all assets, funds, investments, and property acquired by Defendants using embezzled X Strategies funds or diverted corporate opportunities, including but not limited to: (a) funds and assets held by or through Stark Defense Industries; (b) personal investments made with X Strategies' funds; (c) 500,000 shares of Renovaro stock; (d) luxury vehicles, jewelry, and other personal property purchased with embezzled funds; (e) gambling winnings obtained using company funds; (f) assets Utley holds at casinos in the form of points, credits, funds, perks, benefits, rewards, or statuses as a result of how much X Strategies' money he gambled at the casinos; (g) real property or interests in real property acquired with embezzled funds; (h) funds and assets held by or through Dicenzo Fitness; (i) other assets traceable to X Strategies' funds; and (j) all Company property.

**COUNT XII - FLORIDA UNIFORM TRADE SECRETS ACT VIOLATIONS**
**(AGAINST UTLEY)**

176. Plaintiff realleges and incorporates paragraphs 1-104 as if fully set forth herein.

177. X Strategies owns and possesses trade secrets within the meaning of FUTSA. Fla. Stat. § 688.002.

178. These trade secrets derive independent economic value from not being generally known and not being readily ascertainable by proper means

because a competitor with access to them can avoid the time, expense, and uncertainty of developing its own customer relationships, pricing strategy, and a competitive product for customers, among other things.

179. These trade secrets gave X Strategies a competitive advantage by allowing X Strategies to provide superior and effective services to customers and remain competitive in the marketplace.

180. X Strategies took reasonable measures to maintain the secrecy of its trade secrets, including limiting access to employees with a business need to know, maintaining confidentiality policies, requiring employees to protect confidential and customer information, and requiring employees to return sensitive data upon termination.

181. Utley acquired knowledge of X Strategies' trade secrets through his employment and under circumstances giving rise to a duty to maintain their secrecy and limit their use to X Strategies' business. Utley stole these trade secrets for his personal use.

182. Utley was not authorized to take X Strategies' trade secrets or otherwise use them outside of his employment.

183. Utley misappropriated X Strategies' trade secrets by using X Strategies' proprietary information to form Tower Strategy Communications and compete directly against X Strategies.

184. Utley's acquisition, disclosure, and use of X Strategies' trade secrets was without X Strategies' consent and constitutes misappropriation under FUTSA.

185. Utley's misappropriation has caused X Strategies actual loss, including lost business, lost profits, loss of competitive advantage, harm to customer relationships, and other damages to be proven at trial.

186. Utley has also been unjustly enriched by his misappropriation of X Strategies' trade secrets in an amount to be proven at trial.

187. X Strategies is entitled to injunctive relief prohibiting Utley from using or disclosing X Strategies' trade secrets and requiring affirmative acts necessary to protect those trade secrets.

188. Utley's misappropriation was willful and malicious because he stole X Strategies' confidential information dating back to 2017 and took steps to limit and harm X Strategies' ability to service its customers.

189. Because Utley's misappropriation was willful and malicious, X Strategies is entitled to exemplary damages and reasonable attorneys' fees under Fla. Stat. § 688.004 and Fla. Stat. § 688.005.

**COUNT XIII: DEFEND TRADE SECRETS ACT, 18 U.S. § 1836 et seq.**
**(AGAINST DEFENDANT UTLEY)**

190. Plaintiff realleges and incorporates paragraphs 1-104 as if fully set forth herein.

191. X Strategies is the owner of trade secrets within the meaning of the DTSA. 18 U.S.C. § 1839(3)–(4). X Strategies holds rightful legal and equitable title to those trade secrets, which it developed and compiled in the course of its business.

192. X Strategies' trade secrets consist of business, financial, and economic information, including: (i) X Strategies' compilations of customer

lists, customer preferences, and other customer information; (ii) X Strategies' pricing strategy; (iii) nonpublic information regarding its clients' needs, expectations, and marketing strategies; and (iv) X Strategies' internal strategies and know-how for structuring and providing effective, competitive services to its customers, among other things.

193. X Strategies' trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors who could obtain economic value from their disclosure or use. A competitor with access to X Strategies' trade secret information could undercut X Strategies' pricing, target X Strategies' clients, and avoid the time, expense, and uncertainty of developing its own customer relationships, business know-how, and bespoke customer product. If this information were generally known, its value to X Strategies would diminish substantially.

194. X Strategies has taken reasonable measures to keep its trade secrets secret, including by limiting access to employees with a business need to know, maintaining confidentiality policies, requiring employees to protect confidential and customer information, and requiring employees to return sensitive data upon termination.

195. X Strategies' trade secrets are related to services used in, and intended for use in, interstate and foreign commerce. X Strategies uses its trade secrets to provide its services to clients nationwide and to international clients.

196. Utley acquired knowledge of X Strategies' trade secrets through his employment with X Strategies under circumstances giving rise to a duty to maintain their secrecy and limit their use to X Strategies' business.

197. Utley misappropriated X Strategies' trade secrets by stealing virtually all of X Strategies' company data and using them for his benefit, and the benefit of his new employer. 18 U.S.C. § 1839(5)(B)(ii)(II).

198. As a direct and proximate result of Utley's misappropriation, X Strategies has suffered actual loss, including lost revenue, lost profits, and loss of competitive advantage, and Utley has been unjustly enriched.

199. X Strategies is entitled to an injunction to prevent Utley's actual and threatened misappropriation of its trade secrets and requiring Utley to take affirmative actions to protect X Strategies' trade secrets, including the return of all materials containing X Strategies' trade secrets. 18 U.S.C. § 1836(b)(3)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff X Strategies, LLC respectfully requests that this Court enter judgment in its favor and against Defendants, and award the following relief:

A. Compensatory damages and special damages in an amount to be determined at trial, but believed to be in excess of $5,000,000;

B. Treble damages pursuant to Florida Statute § 772.11 (Civil Theft);

C. Treble damages pursuant to 18 U.S.C. § 1964(c) (RICO);

D. Exemplary damages under Fla. Stat. § 688.004 and 18 U.S. Code § 1836

E. Disgorgement of all profits, benefits, and proceeds obtained by Utley as a result of his wrongful conduct;

F. Imposition of a constructive trust on all assets, funds, accounts (including at casinos), investments, and property traceable to X Strategies' funds;

G. Temporary, preliminary, and permanent injunctive relief, including an asset freeze (including at casinos), enforcement of the Employment Agreement, return of all of X Strategies' trade secret information, and a forensic analysis of all of Utley's devices, among other things.

H. An accounting of all funds, assets (including at casinos), and business opportunities diverted by Utley from X Strategies;

I. Attorney's fees and costs;

J. Pre-judgment and post-judgment interest at the highest rate permitted by law;

K. Punitive damages;

L. Any other relief X Strategies would be entitled to by law; and

M. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

X Strategies demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Paul Punzone*
Paul Punzone
Florida Bar No. 1003511
Paul.punzone@hklaw.com
HOLLAND & KNIGHT LLP
100 N. Tampa Street, Suite 4100
Tampa, FL 33602
(813) 227-8500
(813) 229-0134 (fax)

Jordan N. Bittle
Florida Bar No. 1031464

jordan.bittle@hklaw.com
515 E. Las Olas Blvd., St. 1200
Fort Lauderdale, Florida 33301
Tel : (954) 525-1000
Fax : (954) 463-2030

*Attorneys for Plaintiff*